Statement of the Case.
MONROE, J.
Plaintiff’s father acquired in his own name, but as community property, one share of the stock of the defendant bank, represented by certificate No. 11, dated June 1, 1889, and, in like manner, acquired 20 shares of said stock, represented by certificate No. 127, dated December 8, 1891. Plaintiff’s mother died in 1893, leaving him as her sole heir, in which capacity he inherited an undivided half interest in said 21 shares of stock. In November, 1894, plaintiff’s father sdld the 20 shares, represented by certificate No. 127, to Ben. R. Mayer, and in December, 1895, he sold the one share, represented by certificate No. 11, to the same purchaser, and both certificates *33 were surrendered, and canceled, and new certificates were issued in their stead. On January 30, 1896, plaintiff’s father died; and in November, 1905, plaintiff instituted suit (No. 906 of the docket of the district court) against the bank here made defendant, Ben. R. Mayer, and the legal representatives of Joe Mendelsohn (being, at that time, under the impression that Mendelsohn had purchased the one share of stock represented by certificate No. 11), praying for judgment decreeing him to be the owner of said undivided half interest, entitled to the dividends thereon, and ordering the purchasers to surrender the certificates for cancellation, and for a writ of mandamus directing the bank to issue new certificates accordingly. For reasons which we need not go into, the suit so instituted was not prosecuted, but plaintiff thereafter instituted another suit (No. 947 of the docket of the district court) against Mayer alone, in which he obtained judgment recognizing him to be the joint owner with Mayer of the 20 shares of stock represented by certificate No. 127, ordering that the same, together with dividends not theretofore declared and paid, be sold to effect a partition, and that defendant account in partition for the dividends which he had collected subsequent to January 30, 1896, the date of the death of plaintiff’s father. The case thus referred to was decided by this court in December, 1908. Leurey v. Mayer, 122 La. 486, 47 South. 839. In the meanwhile, on January 27, 1907, there had been pledged to the Louisiana State Bank, to secure a loan of $22,500, made to Mayer, certificates Nos. 175, 227, and 229, for 10, 20, and 15 shares of defendant’s stock, respectively, and the holding bank brought suit against the present defendant praying for a writ of mandamus to compel it to cancel said certificates and issue new ones in their stead, and defendant resisted the demand, so far as the certificates 227 and 229 were concerned, alleging that plaintiff herein had brought suit, and obtained the judgment against Mayer (to which we have just referred) recognizing him to be the owner, in indivisión, of 20 shares, represented by certificate No. 127, being one-fiftieth of its (defendant’s) capital stock, and that it was informed and believed that (quoting):
“Part of the certificates described and sued for in the petition herein as being the property of the relator herein were originally issued to represent the said undivided one-fiftieth interest; * * * that it cannot issue the certificates herein claimed and the certificates for the undivided one-fiftieth interest referred to in the suit of Leurey v. Mayer without thereby increasing its capital stock,” which it cannot lawfully do; “that, before it can be required to issue the certificates herein claimed, the several parties asserting conflicting claims_ to the ownership of said fiftieth interest in said bank should be cited hereto and should be ordered to litigate between themselves, in order to determine who is the true and legal owner of the interest sued for by the said Leurey in the suit above mentioned, and who is, justly and legally, entitled to claim and demand from respondent certificates for the stock representing said interest.”
And it prayed that the relator, the Louisiana State B'auk, be ordered to litigate and determine, contradictorily with Leurey—
“with another bank, which was said to have had some interest, and with Mayer, the question of the ownership of the property, and that it be relieved until the matter should have been thus determined.”
It was, however, held by this court, on appeal, that the relator (bank), having acquired the certificates presented by it in good faith and in the usual course of business, was entitled to be recognized by the corporation as the owner of the stock, and could not be required, as a condition precedent to such recognition, to litigate its title with a third person, claiming under a certificate which had previously been surrendered and canceled, the question whether such cancellation and the issuance of the new certificate were authorized, being one (it was held) which the corporation and the third person *35 should settle between themselves, and the mandamus was issued as prayed for.
State ex rel. Louisiana State Bank v. Bank of Baton Rouge, 125 La. 138, 51 South. 95, 136 Am. St. Rep. 323. While the suit thus referred to was pending, the defendant herein had enjoined the plaintiff from proceeding to sell, under his judgment, in the suit of Leurey v. Mayer, the interest in its capital stock represented by original certificate No. 127, .together with the dividends not theretofore declared and paid, and by a judgment handed down in June, 1910, this court set the injunction aside, holding (to quote the syllabus) that:
“A banking company has no standing to enjoin a judicial sale of an alleged stock interest in' the corporation for the purposes of a partition between other parties, as such a sale will not affect any rights or defenses the corporation may have in the premises.”
And shortly thereafter plaintiff brought the present suit, in which, after alleging the facts which have been hereinabove set forth, he further alleges, in substance, that the one share of stock represented by certificate No. 11 (as well as the 20 shares represented by certificate No. 127) was transferred by defendant to Mayer; that defendant- was judicially notified of the suit No. 906, and had actual knowledge of the suit No. 947 and of the judgment therein rendered, but that it nevertheless continued to hold out Mayer as the owner of said stock, and converted the same and transferred it to him'; that such conversion, transfer, and reissuance of certificates did not destroy the identity of petitioner’s stock or his title thereto; that both defendant and Mayer knew of petitioner’s interest, and the transfers were made by them in fraud and bad faith; that in May, 1910, defendant increased its capital stock from $50,000 to $250,000, and that his said interest, exclusive of dividends, is now worth $7,000, wherefore he prays for judgment ordering defendant to issue to him certificates representing stock to the value that his original shares would now have if they had not been so transferred, and condemning it to pay him all dividends thereon since January 3, 1S96, with legal interest, or, in the alternative, that defendant be condemned to pay him $7,000 as the value of said stock, together with said dividends and interest.
Defendant admits that J. E. Leurey (plaintiff’s father) acquired 21 shares of its stock, and that they were transferred to Mayer, as alleged by plaintiff. It avers that the first notice which it received that plaintiff claimed any interest therein was derived from his suit (No. 906), instituted on November 16, 1905, at which date the stock had been pledged by Mayer, the transferee of J. E. Leurey, and that it (defendant) was subsequently condemned by judgment of court to issue new certificates to the pledgee, who had become the owner; that its entire capital is $250,000, divided into 2,500 shares of $100 each, and that, certificates for all the shares having been issued, it cannot lawfully issue more; that it acted in good faith in permitting the transfer of shares by persons in whose names the shares stood on its books, and cannot be made liable to persons having latent equities therein; that the amount paid by Mayer for the 21 shares in question was $2,100, the full market value at the time, and, should it be held liable at all, it should be for only the half of that amount with legal interest from January 30, 1896.
It is admitted that B. R. Mayer was a director in the defendant bank when he bought the stock in question, and so continued until May, 1908; that S. G-. Laycoek was a director of the bank in 1905, when the suit of Leurey v. Bank, No. 906, was instituted, and that he was the attorney for the bank and also for Ben. R. Mayer, the defendant in the suit of Leurey v. Mayer, No. 947. Mr. Mayer testifies that he paid $100 a share *37 for 20 shares of the stock purchased from Leurey, which he thinks he bought in 1893, though it was not transferred until the next year; that the amount so paid was the book value, and that the stock could not be said to have had a market value as it was not listed on the stock exchange, had not been offered in the market, and no dividends were declared until 1S94.
Mr. Knox, the president of the bank, testifies that he knew Leurey (plaintiff's father) merely to speak to him on the street, and did not know anything about his family or that he had a wife. He, also, testifies as follows:
On cross-examination:
“Q. Wasn’t the actual value of the stock greater than the book value, and don’t you so consider it? A. I don’t know. I didn’t have any for sale, and I didn’t put any value on it. I simply held it, and I have never sold any.”
Redirect:
“Q. Have you known since 1905 of any -sale of stock of the Bank of Baton Rouge at the book value of it? A. I don’t think that any was ever sold at that price. It would not pay a party to pay full book value. They would not get dividends sufficient to warrant their paying such a price. Q. You have never known of a sale at full book value, have you? A. No, sir.”
Recross:
“Q. You base that on the dividend producing power, that it would not pay a man to pay full value for the stock, because, if a man simply wanted it for an investment, it wouldn’t pay him anything? A. Yes, sir; the dividends would not warrant it.”
The evidence further shows that in November, 1894, with a capital of $50,000, the books of the bank showed a surplus of $55,000, and the cashier certifies that the book value of the stock was $128.07 per share; that in December, 1895, the surplus was $75,000, and the book value $154.06 per share. On the other hand, the dividend which was declared for each of the years 1894 to 1900, inclusive, was only 4 per cent., after which it ran from 6 per cent, to 10 per cent., save for 1906, when it was 5 per cent. In May, 1910, the bank was reorganized and the capital fixed at' $250,000, divided into 2,500 shares of $100 each, payable one-fifth by the surrender of the outstanding certificates' and four-fifths in cash, and a dividend (No. 34) was then declared of 400 per cent., “which, with the original stock, formed the capital for the reorganized bank,” after which, in June, a dividend (No. 35) of 70 per cent, was declared, so that, the whole of the original capital having been divided into shares and distributed, the reorganization operated no change in that respect.
Opinion.
[1,2] A corporation, the capital stock of which is transferable only upon its books, is the custodian of the shares therein, and, being vested with the power and charged with the duty to protect the interests of the owners of such shares, it must repair any injury which they may sustain by reason of its failure properly to exercise such powei' and discharge such duties; and, where it permits shares to be transferred, without the authority of the owner, it may be compelled to replace them, if there are other shares-within its control, or, if there be no other-shares within its control, it must respond! in damages. Marshall on Corporations, § 321, p. 843; Cook on Stock and Stockholders, etc., § 581, p. 646 et seq.; Woodhouse v. Insurance Co., 35 La. Ann. 238; Western Union Tel. Co. v. Davenport, 97 U. S. 369, 24 L. Ed. 1047; Fairex v. Railroad Co., 36 La. Ann. 60. The amount of the capital stock of a corporation being fixed by its charter and divided into aliquot parts, it is no more possible to add parts in excess of the number which constitute the whole than it would be to add another to the two halves constituting any other whole thing; and, as all the parts into which the capital stock of the defendant now before the court is divided have *39 been distributed and are" outstanding beyond defendant’s control, it follows that no such parts or shares can be awarded to plaintiff, whose remedy, therefore, resolves itself into a claim for damages.
[3] Unless the true owner of the stock is estopped, the fact that the corporation acted in good faith and without negligence, in recognizing and registering an unauthorized transfer, is no defense against such owner. It is true that:
“Where a corporation acts in good faith and without negligence in allowing a transfer b5' one who appears to be the absolute owner of shares, it is not liable to one having a mere equitable title by virtue of a prior unregistered transfer or otherwise of which it had no notice.”
[4] In the case at bar, however, the title of the plaintiff was a legal title, and the law under which it was derived was, and is, to be read into that under which the defendant corporation was created. As was said in deciding the case of the plaintiff against Mayer (122 La. 487, 490, 47 South. 839):
“A private sale by the surviving husband of the half interest of his minor son in bank shares, made without an order of court, issued on the advice of a family meeting, is a nullity. The purchaser at such sale, knowing that the shares were acquired dhring the marriage and the wife was dead, was bound to know that the property belonged to the community and was owned jointly by the surviving husband and the minor heir of the wife.”
[5, 6] It is likewise true that, although Mayor was a director in the defendant bank and possessed the actual and constructive knowledge imputed to him in the foregoing excerpt, his actual knowledge cannot be imputed to the defendant, since, in purchasing the stock, he was acting in his own interest and not in the interest of the bank, and the case in that respect falls within the doctrine announced in the case of Seixas v. Citizens’ Bank, 38 La. Ann. 424, in which it was held, in effect, that the knowledge even of the president of a bank will not be imputed to the corporation in a ease where the matter involved is business transacted by the president in his official capacity, on the one side, and as an individual, on the other, and where he transacted it with reference to his own interest and without regard to the interest of the bank. Nevertheless, the bank here made defendant was bound to know as a matter of law that there is such a thing as the community of acquets, which presumably exists between married people in this state, which may at any time be dissolved by the death of either of the spouses, and that, when it is so dissolved, the heirs of the deceased spouse become the owners of one-half of the community property, whether it stands in the name of the deceased spouse, or in that of the survivor. Defendant was informed of plaintiff’s claim of ownership of the shares of stock here in question when it was cited in the suit instituted by plaintiff in November, 1905, in which it was made party defendant, and was-called on to deliver said shares. Prior to that time, however, the certificate No. 127, which had been issued to plaintiff’s father, had been surrendered and canceled and the shares represented by it had been merged in other certificates, which had been merged in still others, etc. (as will appear from the record and opinion in the case of State ex rel. Bank v. Bank of Baton Rouge, 125 La. 142, 143, 51 South. 95, 136 Am. St. Rep. 323), and, though there was still stock standing in the name of Mayer, it is not- altogether clear, what, in the absence of any more specific action than was taken by plaintiff, it could or should have done further than to do as it did; i. e., answer to the suit, to which it and Mayer were both made defendants, that it could not transfer to the plaintiff the 20 shares of stock standing in the name of Mayer, until, contradictorily with Mayer, he had established his title to it. Mayer appears, thereafter, in January, 1907, to have pledged the stock standing in his name, and *41 the pledgee became the owner of it in January, 1909, and no effort was made by either plaintiff or defendant to prevent his using it in that way, the consequence being that the pledgee thus acquiring it was held in the case last above mentioned to have a good title, the certificates acquired by it not including the original certificate which had been issued to Leurey, but being certificates issued in the name of the pledgor. We do not find, therefore, that defendant can he held to have acted in bad faith in the matter. In treating of the measure of damages in such cases, a well-known author gives three rules, to wit: (1) The value of the stock at the time of the conversion, or a reasonable time after; (2) its value on the day of trial; (3) the highest market value between the date of the conversion and the day of trial. Of rule 3, he says that it obtains in South Carolina and Georgia, and formerly obtained in New York and Pennsylvania, but that in the two states last mentioned the courts have wholly receded from it, and now hold that the measure of damages in such actions is the value of the stock at the date of the conversion. Of rule 2 the author says that it has “found little favor and there is believed to be no good reason for its adoption.”
“The courts [he says] in general incline to the rule that the true measure of damages is the value of the stock at the time of the conversion, or a reasonable time after.”
He further says that the term “value of the stock” is usually tó be understood as the market value, though, from the authorities cited, it would appear that the value may also be determined with reference to the dividend making capacity, the good will, etc. The conversion is said to take place in general on the day of the demand for and refusal of delivery.
“It is settled law [he continues] that, in addition to the valúe of the stock at the date of conversion, the plaintiff may recover legal interest upon such valuation from the day of the conversion to the day of the trial. * * * In addition to interest, the plaintiff may recover also all accretions to the property made during the time when he was deprived of it. He is therefore entitled to judgment for all dividends paid upon the stock between the date of the conversion and the day of the trial.” Cook on Stock and Stockholders and Corporation Law, § 581, p. 646 et seq.
There are, no doubt, some transactions in stocks, in which to hold a defendant liable only for the value of the stocks at the date of their actual conversion would afford a very inadequate remedy; as, for instance, where one, acting through a broker, buys stocks with the intention of holding them for a rise in the market and the broker sells them without authority and delays giving notice to his principal, so that the latter loses the opportunity of availing himself of the rise that he expected, there is a loss of profit which was within the contemplation of the contract, and which should be borne by him through whose fault it is made. Galigher v. Jones, 129 U. S. 193, 9 Sup. Ct. 335, 32 L. Ed. 658. And so, where, as in the case between the plaintiff and Mayer, the element of bad faith is found, but, as between the plaintiff and the defendant before the court, whilst the defendant is liable, because it failed to discharge its obligation to him in the matter of the custody of his property, it is impossible to impute to it such knowledge as will convict it of bad faith, since, in order to do so, we should have to impute not only knowledge of the law, establishing and regulating the community and the devolution of property, etc., but also knowledge of the facts that plaintiff’s father was married, and had a son, issue of the marriage, that the stock in question was acquired during the life of his wife, and that she was no longer living when it was sold, etc. As the matter stands, the most that can be said as to defendant’s action is that it was negligent in failing to inform itself of facts which it *43 was its duty and business to know. Again, as plaintiff’s father thought it advisable, or found it necessary, to sell the stock in question when he did, there is no good reason for supposing that the same father, acting as tutor, with the advice of a family meeting and by order of court, would not have pursued the same course. We are therefore 'of opinion that the conversion should be held to have taken place when the stock was transferred to Mayer, and with no bad faith on the part of defendant. Badillo & Chauvin v. Tio, 7 La. Ann. 487.
[7] As to its value, at that time, the witnesses for defendant inform us 'that none had ever been put upon the market, so that to adopt its market value as the basis of a judgment would be to rest the judgment upon a basis that has no existence. According to the evidence, however, the stock in November, 1894, when the 20 shares were sold, was worth its due proportion of the actual assets and good will or money earning capacity of the bank. The -bank itself furnishes the evidence that, valued upon the basis of the assets alone, the 20 shares sold in November, 1894, were worth $128.07 per share, or a total, for plaintiff’s 10 shares interest, of $1,280.70, to which must be added one-half of $154.08, or $77.03, the value of one share, sold in December, 1895, making a grand total of- $1,357.73. To add to this amount the “accretions” from the date of the conversion to that of the trial would be tantamount to fixing the value of the stock as of the date of the trial rather than as of the date of the conversion, which, for the reasons stated, we do not think should be done. Plaintiff is, however, entitled to legal interest upon the amount thus found due him from the date at which it fell due. Orleans Drainage Co. v. De Lizardi, 2 La. Ann. 282; Arrowsmith v. Gordon, 3 La. Ann. 105 ; Chamberlain v. Worrell, 38 La. Ann. 347; Houssiere-Latreille Oil Co. v. Jennings-Heywood Oil Syndicate, 127 La. 1000, 54 South. 318.
It is therefore ordered, adjudged, and decreed that the judgment appealed from be amended by increasing the one amount allowed from $1,050 to $1,280.70, and the other amount from $50 to $77.03; and, as thus amended, affirmed.
BREAUX, C. J., takes no part.