(81 South. 760)

No. 21856.

BLUM et al. v. ALLEN et al.

(May 5, 1919.)

*(Syllabus by the Court.)*

1. DESCENT AND DISTRIBUTION ⬅90(1)—SUCCESSION — ACTION BY HEIRS — CONDITIONS PRECEDENT—PAYMENT OF INHERITANCE TAX.

Heirs have no standing to sue for the recovery of property inherited by them until they shall have been recognized by a judgment, obtained contradictorily with the inheritance tax collector, putting them in possession and fixing the inheritance tax.

2. EVIDENCE ⬅461(1) — PAROL EVIDENCE—RECORD TITLE TO REALTY.

Recorded titles to real estate cannot be destroyed nor new titles created by parol evidence as to the unfulfilled intentions of former owners who are not brought into court for reformation of such titles or otherwise.

3. CORPORATIONS ⬅428(11)—KNOWLEDGE OF PRESIDENT OR MANAGER—CONFLICTING INTEREST.

A corporation is not bound by the knowledge of its president or manager in a matter in which it is to his interest, conflicting with that of the corporation, to conceal such knowledge.

O'Niell, J., dissenting in part.

Appeal from Fifteenth Judicial District Court, Parish of Calcasieu; Winston Overton, Judge.

Suit by Aaron Blum and others against William Allen and the Sabine Land Company. Judgment of nonsuit, and the Sabine Land Company alone appeals, and plaintiffs, answering the appeal, pray for judgment in their favor. Judgment set aside in so far as relating to Sabine Land Company, and judgment in its favor rejecting plaintiffs' demands quieting its title and dismissing the suit.

McCoy & Moss, of Lake Charles, for appellant.

Williams & Williams, of Lake Charles, for appellees.

Gustave Lemle, of New Orleans, amicus curiæ.

Statement of the Case.

MONROE, C. J. Plaintiffs, Aaron Blum and the heirs of M. Marx and wife, deceased, all residents of Texas, prosecute this suit against William Allen and the Sabine Land Company, alleging as their cause of action:

That they are the owners of the east half of section 35, township 9 south, range 13 west, in Calcasieu parish, and that the Sabine Land Company claims title thereto under a fraudulent and void conveyance from William Allen, the circumstances connected with the execution of which are alleged to be as follows, to wit:

That on September 28, 1896, W. L. Fairchild acquired from the Leon & H. Blum Land Company a large number of tracts of land in Calcasieu parish, and in payment therefor gave his notes to the amount of $2,500; that on March 16, 1898, in consideration of the payment of those notes by the firm of Marx & Blum, he executed a conveyance to M. Marx and Aaron Blum, the members composing that firm, which was intended to include all of the tracts that had been

thus acquired by him, but, that there were, through error, omitted from that conveyance the east one-half of section 35, here claimed, and portions of sections 33 and 34, the whole amounting to about 900 acres. That W. L. Fairchild thereafter died, leaving a widow and heirs; and in 1907 Marx & Blum, through their agent, C. P. Hampton, negotiated an "arrangement" with them whereby they agreed to convey said 900 acres to Marx & Blum for a price much below the value of the same, and, in furtherance of that agreement executed deeds intended, in the one instance, to convey their rights to the land in sections 33 and 34, and in the other instance to convey their rights to the land in section 35, which is here claimed; but,

As the said special agent of Marx & Blum (Hampton) had agreed with William Allen that he, Allen, was to purchase the tracts in sections 33 and 34, and, being uncertain as to whether Marx & Blum had parted "with their title, the vendors, in each of the said * * * deeds left the name of the vendee in blank; the intention of all of said parties being that the property should be conveyed to the said Marx & Blum, or to any one to whom they had conveyed it; and that E. J. Fairchild, one of the vendors and acting as the agent of the other vendors, should write the name of the vendee in each of the said * * * deeds, under the supervision and direction of the said agent of Marx & Blum."

Further alleging that, after the deeds had been signed by the vendors, they got into the possession of William Allen, who wrongfully and fraudulently wrote his name, as vendee, in each of them, and caused them to be recorded; and that thereafter he executed a pretended deed, purporting to convey the property to the Sabine Land Company, of which he was president and manager, and which company "acquired said pretended deed" with full knowledge of the fraudulent character of Allen's pretended title; that said pretended conveyances are clouds upon their title; . that no one is in actual possession of the property, but that "they are the legal and bona fide owners of the same, and were the legal and bona fide owners * * * at the time the said deeds were executed." They pray that Allen and the Sabine Land Company be cited, that the title held by them be decreed void, and that they (petitioners) be decreed the legal and bona fide owners of said property.

Defendants excepted to the right of the heirs of Marx to prosecute this suit because of their noncompliance with the provisions of Act 109 of 1906, relating to inheritance taxes; and also to the right of any of the plaintiffs to prosecute because of lack of necessary parties, which exceptions, having been overruled, they answered, denying the allegations of fraud and knowledge of fraud, and alleging that the Sabine Land Company had, for more than seven years prior to the institution of the suit, been the lawful and bona fide owner of the property claimed. There was then a trial on the merits, after which the district court rendered a judgment of nonsuit, from which the Sabine Land Company alone appealed. The plaintiffs have, however, filed an answer to the appeal in which they pray for judgment in their favor.

We find the facts, as disclosed by the evidence, to be as follows: As far back as 1907, and perhaps prior to that time, C. P. Hampton appears to have been engaged in business in Calcasieu parish as a real estate agent and broker and to have represented Marx & Blum, of Galveston, Tex., in the matter of looking after certain lands owned by them in that parish, including those acquired from Fairchild. Whether he or they discovered the alleged error in the conveyance from W. L. Fairchild of March 16, 1898, does not appear, but there is testimony to the effect that he was authorized to negoti-

ate upon the subject, and did conduct negotiations with E. J. Fairchild (the only one of the heirs who lived in the parish), from whom he ascertained that the widow and heirs of W. L. Fairchild, who lived in three different states, would sell their interests in the sections 33, 34 and 35, by quitclaim deeds, upon being paid $500, and, upon the basis of that information, he approached William Allen, who, after some consideration, agreed to pay $500 for the Fairchild interests in sections 33 and 34, nothing, apparently, having been said to him about the interest in section 35, or about any interest that Marx & Blum might have in any of the property. E. J. Fairchild was, however, informed that Allen was going to take part, if not all, of the land, and he sent to each of the three groups into which his mother and coheirs were gathered, in different states, two quitclaim deeds (one of the land in sections 33 and 34 and the other of that in section 35) for signatures, the names of the expected grantees being omitted, with the understanding that he was to fill them in and deliver the deeds upon the payment of $500, and it probably having been understood between him and Hampton that he would deposit the deeds in bank, and that Hampton would be present at the closing of the transaction. As between him and his mother and coheirs, he was authorized to fill in the names, receive the money, and deliver the deeds, with or without Hampton; and, as they had agreed to take $500 for their interests in all three of the sections, and Allen was prepared to pay that amount, it does not appear to have occurred to Fairchild that it could make any difference whether Hampton was present or absent. Allen, it seems, on learning that the deeds were in the bank, called there and asked to see them, and, they being shown to him, he observed that no grantee's names were written in them, and also that there were deeds for more land than he had understood that Hampton was purchasing for him. Thereafter Fairchild was telephoned for, and he and Allen went to the bank together, and, the deeds having been again produced, the following conversation (according to Allen's testimony), took place between him and Fairchild, to wit:

"I said, 'Mr. Fairchild, here are some deeds which you have left here, I understand, to be delivered to me upon my payment of the sum of money which this memorandum or draft calls for, and,' I said, 'my name is not inserted in these deeds, and I do not want to take deeds under the circumstances, unless I have an understanding with you as to what your understanding of the transaction is, and I would like to have you tell me, before Mr. Knapp here (Mr. Knapp being the note clerk) if you understand that you are selling to me this land.' He said, 'Yes; Mr. Hampton told me that he was buying the land for you.' 'Now,' I said, 'you understand you are conveying these lands to me, all this land for the amount of money I am paying you.' He said, 'Yes; that is my understanding with Mr. Hampton.' I said, further, 'This is all the money you are getting for this land; this pays you in full for conveying these lands?' He said, 'Yes; that is my understanding.' I said, 'Mr. Fairchild, if that is your understanding, come with me over to Mr. Mayo's office and have him, as he made out the deeds originally, insert my name under your instructions; then the transaction will be satisfactory to me.' So we crossed the street over to Mr. Mayo's office, * * * and Mr. Mayo (who is a notary) inserted the names in the deeds, Mr. Fairchild and myself being present. We then went back to the bank, and I gave Mr. Fairchild his money," etc.

The testimony thus given is not only not denied by Fairchild, but is substantially corroborated by him, save that his impression was that the writing in the deeds was done at the office of Allen's attorneys; his recollection being evidently at fault in that respect. Moreover, he gives the following, with other testimony, to wit:

"I will say this, that some of the heirs were in three different states at that time, and they did not know when I was coming over to Lake Charles to wind up this transaction. The heirs had put the matter entirely in my hands for

final winding up. * * * Q. And you knew that he (Allen) was the party who was buying the lands? A. Mr. Hampton told me that; that he had negotiated with Mr. Allen, selling him land from the Blum people, and he was going to take part of these, if not all of them. Q. And you were conveying all of those lands for the $500? A. Yes, sir; we were to get $500."

Allen further testifies that, some little while after the closing of the transaction as above mentioned, Hampton said to him:

"I don't think you treated me right, Mr. Allen, about that Fairchild transaction. * * * I didn't intend that all of that land should go to you,"

—to which he replied:

"Well, Mr. Hampton, it was very evident that you were buying all of that land with my money, that, as my representative, you offered a certain sum of money for that land, and that you were buying it with my money. I think my conduct in the matter has been entirely correct, but I think yours has not been."

And he gives the following, further testimony, which stands uncontradicted, to wit:

"On a subsequent visit (to Lake Charles) * * * while discussing other land transactions, which we had after that time, Mr. Hampton finally said, 'I think you should allow me more than you did on that Fairchild transaction;—you got more land than you were figuring on getting.' 'Well,' I said, 'I am willing to do that; I don't want to do a thing unfair in this thing; I am perfectly willing to allow you $50 additional. My transaction with Mr. Hampton was not based on a percentage basis.' So Mr. Hampton said, 'All right,' and I gave him, then and there, a check for the additional allowance, which he wanted for having purchased 35 for me."

Mr. Hampton testifies that he and Mr. Allen had an understanding that they would meet on Thursday and close the transaction, but that Allen went in before the time appointed and "swiped" the whole thing. Being asked who was to get the land in section 35, he replied:

"It was to go to Blum. The deed was to be put here for my benefit, I was to take it out, but he intercepts me here by saying that he would come on Thursday. Instead of that, he slips in on Monday, and swipes the whole thing; just swipes it up bodily."

It appears that plaintiffs brought a suit of this kind several years before bringing this one, and that, then, as now, they were nonsuited.

### Opinion.

[1] Act 109 of 1906 makes it unlawful for any heir or legatee to take or be in possession of any part of the things or property comprising the inheritance until he shall have been recognized as heir by a judgment, obtained contradictorily with the inheritance tax collector, putting him in possession and fixing the inheritance tax. We are therefore of opinion that the heirs of Marx have no standing to prosecute this suit. Succession of Pavey, 124 La. 525, 50 South. 518; In re Coreil's Estate, 137 La. 702, 69 South. 145.

The allegation of the original petition, to the effect that Allen fraudulently inserted his name in the deed, was modified by a supplemental petition in which it is alleged that "if he did not, with his own hand, write his name in said deeds, it was so written at his wrongful and fraudulent instance and procurement." It cannot be said that either of the allegations is sustained by the evidence; and, whilst we find nothing to commend in the course pursued by Allen in his acquisition of the title to the land in section 35, it appears, from the point of view expressed by him in his quoted remarks to Hampton, to be rather more defensible than the course pursued by Hampton. We consider it unnecessary, however, for the purposes of the case here presented, to go further into that question.

Plaintiffs allege that M. Marx died in 1909, and that at that time Marx & Blum were "the joint and bona fide owners of the * * * the east one-half of section 35," and that, by reason of the death of Marx that property is now owned by his surviving

partner and widow and heirs. But they also allege that, in 1896, the "Leonard & H. Blum Land Company sold a large quantity of land to W. L. Fairchild, in payment for which he gave notes to the amount of $2,500; that on March 16, 1898, in consideration of the payment of those notes by Marx & Blum, Fairchild conveyed almost all of the land so acquired by him to that firm, and that it was the intention to include in that conveyance the land in section 35 which is here claimed, as also certain land in sections 33 and 34, but that "through error and inadvertence this land, amounting to over 900 acres, was left out of said deed"; that, after the death of Fairchild, "Marx & Blum, through their special agent and attorney in fact, C. P. Hampton, * * * negotiated an arrangement with said widow and heirs of the said deceased, W. L. Fairchild, by which the said widow and heirs agreed to convey to them, Marx & Blum, the whole of said 900 acres of land for a price very much less than the actual value of the property; the said widow and heirs being induced to do so by the claim of Marx & Blum that this property should have been included in the said deed made to them by W. L. Fairchild, * * * and had been left out of said deed through error and inadvertence."

They then allege that, in execution of the agreement so entered into (which is neither alleged nor shown to have been reduced to writing), the widow and heirs of Fairchild executed a deed conveying the lands in sections 33 and 34, but omitting the name of the grantee, "as the special agent of Marx & Blum, had agreed with William Allen that he * * * was to purchase" those lands, and that they executed deeds conveying the lands in section 35; "and, being uncertain as to whether Marx & Blum had parted with their title, the vendors in each of said * * * deeds left the name of the vendee in blank, the intention of all parties being that the property should be conveyed to the said Marx & Blum, or to any one to whom they had conveyed it; and that E. J. Fairchild, one of the vendors and acting as the agent of the other vendors, should write the name of the vendee in each of the said deeds, under the supervision and direction of the said agent of Marx & Blum."

Then follow allegations to the effect that the deeds "got into the possession of one William Allen, who, without right and wrongfully and fraudulently, wrote his own name" therein, caused the deeds to be recorded, and thereafter "executed a pretended deed purporting to convey said property to the Sabine Land Company," which now asserts ownership thereof.

The final allegation is:

"That all of the property herein referred to, in sections 33, 34, and 35, was intended to be included in the said deed executed by the said W. L. Fairchild to the said M. Marx and Aaron Blum in the 16th day of March, 1898, but was left out of said deed through error and inadvertence."

And the petitioners then pray that Allen and the land company be cited, and "the said pretended title of said company and of the said Allen * * * be decreed * * * null and void, and that the petitioners have" "judgment decreeing them the legal and bona fide owners of said property, with the improvements thereon, free from any right or claim in favor of the said Allen or of the Sabine Land Company," etc.

[2] As it is alleged that no one is in possession of the land claimed by plaintiff, the action is neither petitory nor possessory, nor yet an action of jactitation; nor, does it come within the provisions of Act 38 of 1908, since that statute provides for cases in which "two or more persons lay claim to land by recorded title and where neither of said claimants is in the actual possession of the land so claimed," etc. The action stands alone, therefore, unauthorized and unrecog-

nized, and is further peculiar in that, after alleging that plaintiffs are the bona fide owners of the land claimed by them, the petition proceeds to show, specifically and unmistakably, that they never have been the owners of that land, but that, from one cause or another, the title which they allege should have been conveyed to them, or was intended to have been so conveyed was in fact conveyed to other parties. The theory of the plaintiffs seems to be that recorded titles to real estate can be destroyed and a new title created by parol evidence as to the unfulfilled intentions of former owners, who are not brought into court for reformation of title or otherwise, and it is clear that no such theory can be sustained. It is undisputed that the title acquired by Allen was conveyed by him to the Sabine Land Company, and, as plaintiffs exhibit no title whatever, they have no standing to attack it.

[3] If, by reason of the failure of W. L. Fairchild to include the land here in question in the conveyance of March 16, 1898, or by reason of the failure of his widow and heirs in 1907 to make plaintiff a title thereto, they have suffered any wrong, they may have a remedy, but it is not to be found in an action of this character; nor, as we conclude from the showing here made, in any action against the Sabine Land Company, which is not bound by the knowledge of its president or manager in a matter, such as this, in which it is to his interest, conflicting with that of the corporation, to conceal such a knowledge. Seixas v. Citizens' Bank, 38 La. Ann. 435; Leurey v. Bank of Baton Rouge, 131 La. 30, 58 South. 1022, Ann. Cas. 1913E, 1168; American Surety Co. v. Pauly, 170 U. S. 156, 18 Sup. Ct. 552, 42 L. Ed. 977; American Nat. Bank v. Miller, 229 U. S. 517, 33 Sup. Ct. 883, 57 L. Ed. 1310; In re United States Hair Co., 239 Fed. 703, 152 C. C. A. 537; Reinhart on Agency, § 356; 2 Corpus Juris, p. 868, § 549; Pomeroy's Eq. Jur. (3d Ed.) vol. 2, p. 1173.

We are therefore of opinion that the defendant company is entitled to a judgment rejecting plaintiff's demands and quieting its title with respect thereto. It is accordingly ordered that the judgment of nonsuit herein appealed from be set aside, in so far as the Sabine Land Company is concerned, and, as to that company, that there now be judgment in its favor, rejecting the demands of the plaintiff, quieting its title, here attacked, with respect thereto, and dismissing this suit at plaintiff's cost.

O'NIELL, J., concurs in the decree, but not in the expression regarding nonpayment of the inheritance tax.