OVERTON, Justice.
 

 This is a suit to recover $2,708.21 on a fidelity deposit bond, signed by defendant as surety, in favor of plaintiff, against the loss, not exceeding $5,000, of any money or other personal property for which plaintiff is responsible, through the fraud, dishonesty, forgery,, theft, embezzlement or wrongful abstraction of Gladys C. Badon, while engaged in the-service of plaintiff, whether these dishonest acts be done directly or in connivance with, others.
 

 Miss Badon, by marriage, after the irregularities complained of began, became GladysBadon Morris, and the bond was promptly altered to show her change in name. The bond was signed in 1923, and was continued in force from year to year until the discovery of the defalcations. When the bond was given, Miss-Badon was assistant secretary and treasurer of plaintiff, but, upon the death of the secretary and treasurer, which occurred several years prior to her defalcations, she was selected to fill the vacancy.
 

 The record leaves no doubt that Miss Badon or, as we shall refer to her, Mrs. Morris, wrongfully abstracted funds belonging
 
 to
 
 plaifitiff in the sum of $2,078.21. This sum-
 
 *551
 
 consists of $1,080.17, being overdrafts for salary, fraudulently made, during a period of several years; of $307.26, fraudulently paid by Mrs. Morris to her sister, Earline Badon, a clerk of plaintiff, in excess of her authorized salary; $73.80, represented by cash receipts unaccounted for; and of $1,266.98, the amount of insurance premiums, fraudulently paid by Mrs. Morris to an insurance agency, in which she was a partner, on policies, covering property in which plaintiff had no interest, either as owner or mortgagee, and the premiums on which plaintiff was under no color of obligation to pay.
 

 The defense rests on a plea of prescription, growing out of the terms of the bond, and upon certain alleged breaches of warranty. Since the plea of prescription rests upon the terms of the bond, we shall quote the pertinent parts of the bond. The fourth article of the bond reads, in part, as follows:'
 

 “Upon the discovery by the employer of any dishonest act on the part of the employee, the employer shall, at the earliest practical moment, and at all events not later than five days after such discovery, give written notice thereof to the surety at its home office. Affirmative proof of loss under oath, together, with full particulars of said loss, shall be filed with the surety at its home office within three months after such discovery. Legal proceedings for recovery hereunder may not be brought until three months have elapsed after such proof of loss has been filed with the surety, nor brought at all unless begun within six months after proof of loss has been filed with the surety. * * * ”
 

 Plaintiff, through some of its officers and directors, became suspicious of the honesty and integrity of Mrs. Morris just prior to September 5, 1931, and apparently lost no time in instituting an investigation into her official conduct. The suspicion arose concerning the failure of Mrs'. Morris to credit a Mrs. Laderman with some $35 for rent, due by her to plaintiff, and her failure to give one of plaintiff’s customers credit on a monthly installment, paid on a loan. These suspicions resulted in a prompt convening of the board of directors of plaintiff, at which William H. Robert, a certified public accountant, was employed tp make an audit of plaintiff’s books. In making the audit, Robert quickly discovered that there was a shortage and reported it orally to plaintiff. Promptly, to wit, on September 5,1931, plaintiff gave notice to defendant of the defalcation, which was at the earliest practical moment, and within five days after its discovery. Thereafter, namely, on September 22, 1931, plaintiff made proof of' loss to defendant as provided by the bond. This proof was clearly well within three months, as the bond provides, from the discovery of the defalcation. Suit was filed on March 5,1932, and service of citation made on March 7, 1932. This was obviously within six months from the day proof of loss was filed with the surety.
 

 Therefore, the prescription provided in the bond should not be sustained, in our judgment, unless it be that Mrs. Morris’ improper conduct was discovered by plaintiff, prior to the date of September 5,1931, named above, as the date of the discovery of her misconduct and plaintiff failed to notify defendant pf the discovery within the five days prescribed by the bond and failed to make proof of loss within three months after the discovery.
 

 
 *553
 
 Defendant most earnestly contends that the foregoing was the case. It relies upon facts showing that, under the rules of the company, Mrs. Morris’ duty was to deposit the funds of plaintiff in bank and to keep the books and the records of the business; that she had no right whatever to draw a check for plaintiff in her favor, except for her salary, which, during virtually the entire period involved, was $150 a month; and that she drew, during a period of approximately three and a half years, some eighty-nine checks for her salary, each of which, under the rules of plaintiff, was countersigned by its president, J. C. Langston. The drawing of these checks, it is shown, began with February, 1928, and ended with August, 1931, and the checks, it appears, were drawn at irregular times during the month and in irregular amounts. During a few of the months of that period, it seems, Mrs. Morris drew less than the amount of her salary for the month, but usually she drew more than the amount thereof, and in March, 1929, she drew, by checks, payable to her order, sums totaling $234.81; in April, 1929, in like manner, she drew sums totaling $419.05; and, in May of the same year, she drew checks totaling $500.87. Each of these was made, as were the other salary checks, payable to her own order, and was countersigned by J. C. Langston, president. These cheeks were charged on plaintiff’s books by Mrs. Morris, as were the remaining cheeks payable to her order. to expenses.
 

 Defendant urges that, as Langston countersigned these checks, it appears that he had the facts before him showing that Mrs. Morris was overdrawing her salary, and therefore that plaintiff necessarily had such knowledge, but failed to report the same and make proof of loss timely. On the other hand, it appears that Langston had full faith in the integrity of Mrs. Morris; that he did not charge his memory with the amounts she was drawing, but considered that she was drawing the checks to pay herself the amount due her as salary; that his attitude towards Mrs. Morris was not only brought about by the fact that she had been working for plaintiff since 1923, during which time she had done nothing, within his knowledge, to- excite his suspicion or cause his confidence to wane, but also by the facts that her books had been examined by certified public accountants twice each year, and reported to plaintiff as being'correct, and likewise once a year by the state bank examiner, and similar reports made of their condition.
 

 An examination of the evidence satisfies us that Langston had not even a suspicion that Mrs. Morris was overdrawing her salary and otherwise misappropriating the funds of plaintiff until the occurrence of the rent and passbook episodes, already adverted to. Assuming, however, without so deciding, that Langston had knowledge of the misappropriations, the conclusion becomes inescapable that then he was aiding her in misappropriating plaintiff’s money-by countersigning the checks and by conniving at -her misconduct. This assumption would be of no avail to defendant, for the obligation of the bond is to secure plaintiff; not only against defalcations made by Mrs. Morris directly, but also in connivance with others. Moreover, the knowledge acquired by Langston by thus conniving at the misconduct of Mrs. Morris, and, in fact, by aiding her in the commission of the misappro
 
 *555
 
 priations, could, not be imputed to plaintiff, within the rule that the knowledge of an officer of a corporation, within the scope of his duties, is the knowledge of the corporation, for it would be so contrary to Langston’s interest to divulge facts, implicating him in dishonest transactions, that it could not he expected of him to divulge them any more than it c-ould be expected of the defaulting secretary and treasurer, Mrs. Morris, to divulge her wrongs as they were being committed by her. Seixas, Syndic, v. Citizens’ Bank, 38 La. Ann. 424; Leurey v. Bank of Baton Rouge, 131 La. 30, 58 So. 1022, Ann. Cas. 1913E, 1168; Blum v. Allen, 145 La. 71, 81 So. 760; 2 C. J. p. 868, § 549; p. 871, § 550.
 

 The fact that Langston or some other officer of plaintiff might have acquired knowledge of the defalcation by examining Mrs. Morris’ books is, as a matter of course, of no ■avail to defendant, for an employer is only required to notify the insurer of facts actually coming to his knowledge. 25 C. J. 1102.
 

 Our conclusion is that the plea of prescription is not well founded.
 

 We now reach the issue concerning the alleged breach of warranties. There is nothing in the bond referring directly or indirectly to warranties. In 1923, when the bond was applied for, a question blank was filled, touching ¿he duties that Mrs. Morris, then Miss Badon, was to perform and the data to be used to detect an unfaithful performance, such as the signing of checks, and the manner thereof; the deposit of funds; the frequency and place of deposit; the examination, and the frequency thereof, of her accounts, and the name of the person to make the examination; the ■manner of making payments; and the amount of Mrs. Morris’ compensation. This blank form ends with the following:
 

 “It is agreed that the above answers shall be warranties and shall constitute the basis of and form part of the bond or any continuation or continuations of same that may be issued by the Fidelity and Deposit Company of Maryland to the undersigned, upon the person above named. And it is agreed that the duties, powers and remuneration of the employee and obligations of the employer as stated in the above warranties shall remain unchanged during the currency of this bond or any continuation or continuations thereof.”
 

 This agreement, however, was never carried out by referring in the bond to the application, and making it a part of the bond, or by reciting in that instrument in unequivocal language that the answers to the questions should be deemed warranties. The recital of these matters in the application alone was insufficient. Reference to them should be made in the bond itself, and not simply in a separate instrument.
 

 “The application unless the statute so requires need not be physically attached tot the policy, but in order representations in the application may be converted into warranties, the reference from the policy to the .application must manifest a clear purpose that they shall be construed together as one contract. A reference to the application for another purpose or a reference not indicating the purpose to make the application a part of the policy will not be sufficient. A recital in the policy that it is issued in consideration of the warranties and agreements in the application and for a specific sum stated is not a sufficient reference to the application to require the
 
 *557
 
 statements therein to be construed as warranties, nor, it has been held, is it sufficient to declare that the statements in an application shall constitute a part of the basis of the contract.” 32 C. J. pp. 1283, 1284.
 

 In 14 R. C. L. p. 1026, § 206, verbo “Insurance,” it is said: •
 

 “The general rule in regard to what constitutes a warranty in a contract of insurance is well settled. Any statement or description, or any undertaking on the part of the insured, on the face of the policy or in another instruíment properly incorporated in the policy, which relates to the risk, is a warranty. A warranty is in the nature of a condition precedent ; it must appear on the face of the policy ; or, if on another part of it, or on a paper physically attached to- it, it must appear that the statements were intended to form a part of the policy; or, if on another paper, they must be so referred to in the policy as clearly to indicate that the parties intended them to form part of it, but it is not necessary that statements in an application be set forth in the policy. * * * ” See, also, People’s State Bank v. United States Fidelity & Guaranty Co., 164 La. 95, 113 So. 779.
 

 The cases of Winkler Brokerage Co. v. Fidelity & Deposit Co. of Maryland, 119 La. 735, 44 So. 449; Ellzey v. Massachusetts Bonding & Ins. Co., 142 La. 818, 77 So. 642; and Davis v. Nat. Fire Ins. Co., 169 La. 63, 124 So. 147, are not in conflict with the views, here expressed. In each of these cases, the application, on the face of the bond or policy, was made a part of it, and showed an intention to make the answers warranties, or else the warranties were set out in the bond or policy.
 

 In the present cáse some of the answers were departed from, as might naturally be expected during the course of eight years, but the departures were such as were of no particular moment, and, since the answers were not warranties, these departures are of no avail to defendant. They were such as the depositing of money, in the course of time, in two banks instead of the one bank named; the change of auditors, the increase, and then, for the last two months, the decrease of plaintiff’s salary, but not below the amount stated in the application, and possibly, on a few occasions, which resulted in no harm, the failure to make deposits as often as “two or three times a week” stated in the application.
 

 We think that the defense of breach of warranties is not well grounded.
 

 The trial judge rendered judgment for plaintiff for the full amount sued for, including penalties. We think that the judgment is correct, save that the judge should not have allowed the penalties, which include attorney’s fees, because it seems to us that the defense, although it has! failed, was, in the language of the statute, upon just and reasonable grounds. The facts of the case, with reference to the plea of prescription, were such as to give defendant reasonable hopes of success. Section 3 of Act No. 37 of 1921 (Ex. Sess.).
 

 The judgment appealed from is amended by striking from it the decree for penalties, including the attorney’s fees, and, as thus amended, the judgment is affirmed, plaintiff to pay the costs of appeal.
 

 ODOM, J., dissents.