475 So.2d 756 (1985)
William L. QUEALY
v.
PAINE, WEBBER, JACKSON & CURTIS, INC., Donald S. Castrone, New England Gas and Electric Association and Vance, Sanders Investors Fund, Inc.
No. 85-C-0495.
Supreme Court of Louisiana.
September 10, 1985.
Rehearing Denied October 10, 1985.
*758 Phillip Wittmann, Douglas Dodd, Jo Strickler, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, for defendant-applicant.
John Baus, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Perry Staub, Monroe & Lemann, Matthew Greenbaum, New Orleans for respondents.
MARCUS, Justice.
This action was filed by William L. Quealy against Paine, Webber, Jackson & Curtis, Inc. (Paine Webber) and New England Gas and Electric Association (NEGEA) for the unauthorized sale of 1,500 shares of NEGEA stock owned by Quealy. Also named defendant was Donald S. Castrone, who bought the shares from an imposter and presented them for re-sale to Paine Webber.[1] Paine Webber filed a third-party demand against William F. Ryan, a notary who prepared and notarized a bill of sale which purportedly transferred ownership of the shares from the imposter to Castrone. NEGEA filed a third-party demand against Paine Webber seeking indemnification for any damages for which it might be cast.
The trial judge rendered judgment in favor of Quealy and against Paine Webber and NEGEA, in solido, in the amount of $32,437.50 for the loss of the shares based on their value on the day before trial,[2] together with $15,840 for lost dividends, and $15,000 in general damages, or a total of $63,227.50. The judge further awarded legal interest from the date of judicial demand until paid on the award for the lost shares and general damages and from the date due on the award for lost dividends. Judgment was further rendered in favor of NEGEA on its third-party demand against Paine Webber in an amount equal to that rendered in favor of Quealy. Paine Webber's third-party demand against Ryan was dismissed.
*759 The court of appeal, finding that Paine Webber and NEGEA were guilty of conversion, affirmed the judgment of the trial court in all respects except to exclude interest on the value of the lost stock and to award attorney fees and court costs to NEGEA on its third-party demand against Paine Webber. It further remanded the case to the trial court to fix the amount of attorney fees and costs.[3] On Paine Webber's application, we granted certiorari to determine the correctness of that decision.[4]
Quealy inherited 1,500 shares of NEGEA common stock from his mother, as well as a small amount of shares in three other corporations. He kept the stock certificates in an unlocked leather suitcase in the room he lived in at a French Quarter hotel. Besides the dividends he received from those securities, his only income was a small Army disability pension. In 1977, a fire at the hotel forced him to move to another nearby hotel. He assumed the stock certificates remained in the suitcase after he moved. In February of 1978, Quealy noticed that he had not received his quarterly dividend and immediately contacted NEGEA. He was informed that the shares had been surrendered. Apparently, the NEGEA stock certificate had been stolen from Quealy's suitcase.[5]
Donald Castrone, sales manager of a West Bank new car dealership, testified that in December of 1977 a man claiming to be William Quealy came to the dealership and spoke to him about purchasing a car. (Several months later, Castrone was introduced to the plaintiff and stated that he was not the same man who came to the dealership). During their negotiations, the imposter stated that he wanted to buy the car with cash and offered to sell Castrone various stocks, including 1,500 shares of NEGEA, at a price below market value. The imposter claimed that he did not want to sell the stock through a broker because he wanted to avoid the usual delays in receiving cash for the stock. Castrone contacted his friend and attorney, William Ryan, and requested advice on the purchase of the stock.
Ryan called Morris Cali, a broker at Paine Webber's New Orleans office, to determine what steps were necessary for Castrone to purchase the stock by private sale and then to sell it for cash without waiting the usual period. Charles Bailey, operations manager of the office, checked with NEGEA and determined that the stock had not been reported as lost, stolen or missing. Cali then advised Ryan that in order to transfer the stock, Paine Webber would require a notarized bill of sale.
Castrone and the imposter arrived at Ryan's home (located in uptown New Orleans) the following evening after Castrone closed the car dealership. Castrone testified that he had gone to Ryan's home on several previous occasions, both for social purposes and to conduct legal business. At Ryan's inquiry, the imposter stated that he had obtained the stock through an inheritance. Ryan asked the imposter for identification, but at trial in December of 1983 (some six years later) could not recall what type of identification was produced. He testified that he did not personally know the man who represented himself as William Quealy. The imposter signed the back of the stock certificate, and he and Castrone signed the bill of sale which Ryan then notarized. Witnesses who subsequently signed the bill of sale did not actually see Castrone and the imposter sign the document. Castrone paid the imposter in cash, outside of Ryan's presence.
The following day (December 9, 1977), Ryan accompanied Castrone to the Paine Webber office with the stock certificate and notarized bill of sale. In order to accomplish the sale and transfer of the NEGEA stock, Castrone opened an account for the first time with Paine Webber. Bailey and John P. Godchaux, manager of the *760 office, each reviewed the documents and satisfied themselves that the bill of sale was properly notarized and that the signature on the back of the certificate matched the seller's signature on the bill of sale. Godchaux approved the sale, and Bailey placed on the certificate a guarantee that the signature was that of the person whose name appeared on the face of the certificate (William L. Quealy). Godchaux and Bailey both testified that Paine Webber guaranteed the seller's signature in reliance on the notarized bill of sale. Godchaux indicated that NEGEA would not have accepted the shares without the signature guarantee. Castrone then sold the stock for cash and received payment. Paine Webber earned a $390 commission on the transaction. Castrone bought the stock from the imposter for $24,000 and sold it for $24,885, making a profit of $885.
Quealy testified that the signatures on the stock certificate and bill of sale were not his, and that he never sold the NEGEA stock nor received any money from its sale. Since he ceased to receive dividends in 1977, practically all of Quealy's income has been derived from his disability pension which is insufficient to meet his expenses. At the time of trial, Quealy was living in a rooming house in New Orleans. He had great difficulty walking and had twice been confined to a wheelchair. He was unable to travel to the courthouse to testify. Quealy was physically unable to work and testified that his living conditions had seriously deteriorated since the loss of the NEGEA dividends.
The issues presented for our determination are:
(1) Whether Paine Webber was guilty of converting Quealy's stock.
(2) Whether the notary was liable to Paine Webber on its third-party demand for notarizing a forged signature.
(3) Whether the trial judge properly awarded the value of the lost stock as of the day before trial rather than the date of conversion.
(4) Whether the trial judge erred in awarding general damages for mental anguish and inconvenience suffered by Quealy for the loss of use of the stock.
(5) Whether Paine Webber was liable to NEGEA on its third-party demand for attorney fees and court costs.

LIABILITY OF PAINE WEBBER
A conversion consists of an act in derogation of the plaintiff's possessory rights, and any wrongful exercise or assumption of authority over another's goods, depriving him of the possession, permanently or for an indefinite time, is a conversion. It is of no importance what subsequent application was made of the converted property, or that defendant derived no benefit from his act. Importsales, Inc. v. Lindeman, 231 La. 663, 92 So.2d 574 (1957).
Without Paine Webber's signature guarantee, NEGEA would not have accepted the stock and Quealy would have remained the record owner. Paine Webber's signature guarantee was therefore a necessary step in the transfer of ownership and was a contributing cause of Quealy's loss. Internal regulations (Internal Control Memo # 50) circulated to Paine Webber employees required that signature guarantees be made only where the employee either knows the individual or takes steps to verify his identity, such as by making a comparison of the signature to a signature card or other similar records. As a member of the New York Stock Exchange, Paine Webber was bound by that association's Rule 405 (also known as the "Know Your Customer" rule) which obliged the brokerage firm to use due diligence in knowing with whom it does business. Godchaux and Bailey testified, however, that they merely relied on the notarized bill of sale as proof that the signature of Quealy was genuine. Bailey guaranteed that the signature was that of the person named on the face of the certificate, although Paine Webber personnel did not know Quealy nor have a record of his signature and the certificate was not signed in their presence. Moreover, although *761 Ryan knew Morris Cali and had an account with Paine Webber, none of the personnel had previously known Castrone.
Under these circumstances, it was not reasonable for Paine Webber to rely on the notarized bill of sale and take no further steps to verify the authenticity of Quealy's signature. In guaranteeing the signature of a person they did not know, who did not sign in their presence, and whose signature they did not compare to other existing records, Paine Webber employees acted in a manner inconsistent with Quealy's property rights. Paine Webber wrongfully assumed control over Quealy's stock and contributed to depriving him of its possession and was liable for conversion. La.Civ.Code art. 2315.

LIABILITY OF NOTARY
In Howcott v. Talen, 133 La. 845, 63 So. 376 (1913), in enunciating the standard of care for a notary who acknowledges a signature, we stated:
[S]o long as he exercises the precaution of an ordinarily prudent businessman in certifying to the identity of the persons who appear before him, it may be doubted whether he has any other function to discharge.... [I]t can hardly be expected that he will ordinarily require more than the reasonable identification of persons who come before him merely to acknowledge their signatures to instruments of any kind.
In Howcott, a notary (Dearing) was approached by Boulmay, a man he had known several years. Boulmay introduced Dearing to an individual who claimed to be heir to a succession. (In fact, the succession never existed and the heir was an imposter scheming to sell property he did not actually own). Boulmay requested that Dearing notarize an act of sale which purported to transfer ownership of property from the imposter to another. Dearing notarized the instrument, and the scheme was later uncovered. This court found that Dearing, as notary, had exercised the care of an ordinarily prudent businessman and was not liable for notarizing the imposter's signature.
In the instant case, Ryan took further precautionary steps than did the notary in Howcott. Like Dearing, Ryan was well-acquainted with the individual (Castrone) who introduced him to the imposter. When Castrone contacted him about the proposed private sale of stock, Ryan called Paine Webber to ascertain the requirements of such a transaction. Bailey testified at trial that a private sale of stock was not unusual. The fact that Ryan notarized the bill of sale in his home at night does not suggest any impropriety, as he had previously done legal work for Castrone in his home after Castrone (who lived in Slidell) finished work. Ryan asked the imposter how he had obtained the stock and requested identification. While Ryan could not recall at trial exactly what type of identification the imposter produced, it should be noted that the trial took place six years after the bill of sale was notarized. Under the circumstances, we are unable to say that the trial judge was clearly wrong in finding that Ryan did not act unreasonably in this transaction. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Clearly, Ryan met the standard of care for a notary as set forth in Howcott. Therefore, the court of appeal did not err in affirming the finding of the trial judge that Ryan was not liable to Paine Webber on its third-party demand for notarizing the signature of an imposter.

MEASURE OF DAMAGES FOR LOST STOCK
The traditional damages for conversion consist of the return of the property itself, or if the property cannot be returned, the value of the property at the time of the conversion. Boisdore v. International City Bank & Trust Co., 361 So.2d 925 (La.App.4th Cir.), writ denied, 363 So.2d 1384 (La.1978). There are some transactions in stocks in which to hold a defendant liable only for the value of the stocks at the date of their actual conversion would afford a very inadequate remedy; *762 as, for instance, where one buys stocks with the intention of holding them for a rise in the market and the broker sells them without authority so that the principal loses the opportunity of availing himself of the rise. Leurey v. Bank of Baton Rouge, 131 La. 30, 58 So. 1022 (1912). Where a commodity which fluctuates in value is converted, its owners should be given the benefit of better prices that prevailed within a few months afterwards. Succession of Gragard, 106 La. 298, 30 So. 885 (1901). Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it. La.Civ.Code art. 2315. Damages are measured by the loss sustained by the obligee and the profit of which he has been deprived. La.Civ.Code art. 1995.
The value of Quealy's NEGEA shares on the date they were wrongfully transferred by Paine Webber to NEGEA (December 9, 1977) was $24,885. Rather than following the general rule in conversion cases and measuring the shares' value as of the date of conversion, the trial judge awarded Quealy $32,437 for the lost stock, which represented its market value on the day before trial (December 13, 1983). The general rule accomplishes the goal of fully compensating the conversion victim in cases where the converted property depreciates over time. In such instances, the victim is made whole by returning to him exactly what was lost. In the case of stock, which fluctuates in value, applying the general rule of damages will not always accomplish the goal of making the victim whole. Such is the case here. In order for Paine Webber to fully repair the damage caused, it must reimburse Quealy in an amount sufficient to enable him to repurchase exactly what was lost: 1,500 shares of NEGEA stock. La.Civ.Code arts. 2315 and 1995. The trial judge thus properly awarded Quealy an amount commensurate with the value of 1,500 shares of NEGEA stock as of the day before trial.[6]

GENERAL DAMAGES
Damages for mental anguish and inconvenience arising from the loss of use of property have been allowed in tortious conversion cases. Alexander v. Qwik Change Car Center, Inc., 352 So.2d 188 (La.1977). Similarly, where property has been wrongfully seized through judicial process, damages for mental anguish and inconvenience due to the loss of use of the property are recoverable. Nassau Realty Co., Inc. v. Brown, 332 So.2d 206 (La.1976); Hernandez v. Harson, 237 La. 389, 111 So.2d 320 (1958). In Hernandez, we stated:
Plaintiff is entitled to recover for humiliation, mortification and mental anxiety, and for physical discomfort and inconvenience as a result of the deprivation of use and enjoyment of his car.... Such an item is not confined to proof of actual pecuniary loss. It is true that there is no proof of malice nor was the seizure characterized by harshness and total disregard to the interests of plaintiff. Yet it was illegally and wrongfully executed, coupled with the continued deprivation of its use for an extended period of time, sufficient to have caused mortification, annoyance and physical discomfort.
The award of general damages in a conversion case, if proven, is clearly supported by the jurisprudence. Quealy testified that except for a small disability pension, the dividends from the converted stock constituted his main source of income and his living conditions were drastically impaired by the loss of those dividends.[7] *763 He was physically unable to work, and on December 14, 1983 (date of trial), he had been without the dividend income for six years. There was ample evidence in the record to support a finding that Quealy suffered mental anguish, humiliation and inconvenience from the loss of use of his property. Therefore, the trial judge did not err in awarding general damages.

LIABILITY OF PAINE WEBBER TO NEGEA FOR ATTORNEY FEES AND COURT COSTS
Attorney fees are not allowed in Louisiana except where authorized by statute or contract. Hernandez v. Harson, supra (on rehearing). Unless the judgment provides otherwise, costs shall be paid by the party cast. La.Code Civ.P.art. 1920.
The trial judge granted NEGEA's third-party demand for indemnification based on Paine Webber's signature guarantee of an imposter. He found that Paine Webber was liable for all costs of the proceedings. The court of appeal stated that Paine Webber was liable to NEGEA for any loss that resulted from the signature guarantee and included within Paine Webber's liability an award of attorney fees and court costs. The court of appeal relied on La.R.S. 10:8-312.[8]
Paine Webber guaranteed the imposter's signature on December 9, 1977. Quealy's suit was filed December 6, 1978. La.R.S. 10:8-312 was enacted by Acts 1978, No. 165, § 1 with an effective date of January 1, 1979. It was not in effect at the time the signature was guaranteed nor when suit was filed. Being substantive in nature, the statute should not be retroactively applied. Therefore, it does not govern this case.[9]
The statutory provisions which applied when Paine Webber guaranteed the imposter's signature are contained in the Uniform Stock Transfer Act. La.R.S. 12:621, et seq. (repealed by Acts 1978, No. 165, § 6, eff. Jan. 1, 1979). Our review of these statutes yields no provision whereby a signature guarantor assumes the defense of the issuer when a claim is made against the latter for wrongful transfer, nor do we find any statutory authority for an award of attorney fees against a signature guarantor in such a case. Furthermore, there was no contractual agreement between Paine Webber and NEGEA that could provide for attorney fees. Thus, the court of appeal erred in finding Paine Webber liable for attorney fees on NEGEA's third-party demand.
Paine Webber was found liable for indemnification on NEGEA's third-party demand and, as the party cast, it was obliged to pay court costs. La.Code Civ.P. art. 1920.
In sum, we find that the court of appeal erred in awarding NEGEA attorney fees on its third-party demand against Paine Webber, and we reverse that portion of the judgment. In all other respects, the judgment of the court of appeal is affirmed.

*764 DECREE
The judgment of the court of appeal is affirmed in all respects except it is reversed insofar as it grants attorney fees to New England Gas and Electric Association on its third-party demand against Paine, Webber, Jackson & Curtis, Inc.
LEMMON, J., dissents from the award of general damages, the measure of damages, and the liability of Paine Webber to plaintiff, but concurs as to Paine Webber's liability on NEGEA's third party demand.
NOTES
[1] Castrone filed for relief under Chapter 7 of the Bankruptcy Code (11 U.S.C. Sec. 701, et seq.) prior to trial and did not take part in these proceedings. Also named defendant was Vance, Sanders Investors Fund, Inc. who settled with Quealy before trial.
[2] To prove the current market value of the stock, Quealy introduced in evidence the NYSE-Composite Transactions of December 13, 1983 appearing in The Wall Street Journal the next day (December 14, 1983) which was the date of trial. Therefore, the value of the stock fixed by the trial judge was based on the closing price for December 13, 1983.
[3] 464 So.2d 930 (La.App. 4th Cir.1985).
[4] 467 So.2d 528 (La.1985).
[5] Three other stock certificates were also stolen from Quealy. The record is unclear as to the disposition of these three certificates; in any event, they are not the subject of this litigation.
[6] The question of what value should be awarded for stock which has declined in value since its conversion is not before us. We note, however, that in such a case, the general rule which measures damages as of the date of conversion would make the owner whole by replacing exactly what he lost. See Atkins v. Garrett, 270 F. 939 (5th Cir.1921).
[7] Due to physical infirmities, Quealy did not testify at trial. His testimony was introduced through a videotaped deposition. Paine Webber objected on relevancy grounds to questions regarding Quealy's living conditions since the conversion, and the trial judge sustained the objections. The trial judge erred in his rulings as this evidence was relevant to the proof of general damages which are recoverable in conversion cases. Moreover, the trial judge awarded general damages based on the record which contained the evidence that he had previously ruled inadmissible.
[8] La.R.S. 10:8-312 provides:

(1) Any person guaranteeing a signature of an indorser of a security warrants that at the time of signing
(a) The signature was genuine; and
(b) The signer was an appropriate person to indorse; and
(c) The signer had legal capacity to sign.
(2) Any person may guarantee an indorsement of a security and by so doing warrants not only the signature (Subsection 1) but also the rightfulness of the particular transfer in all respects. But no issuer may require a guarantee of indorsement as a condition to registration of transfer.
(3) The foregoing warranties are made to any person taking or dealing with the security in reliance on the guarantee and the guarantor is liable to such person for any loss resulting from breach of the warranties.
[9] Because La.R.S. 10:8-312 was not in effect when Paine Webber guaranteed the signature, we do not reach the question of whether the term "any loss" includes attorney fees.