GAUDIN, Judge.
This litigation concerns a lease entered into between (1) Gilbert E. Copeland and his son, Gilbert E. Copeland Jr., appellees, and (2) P. Michael Drury and Mark Deles-dernier Jr., d/b/a D & D Investments, appellants.
In a bifurcated bench trial in the 24th Judicial District Court, the trial judge found that D & D had violated terms of the lease agreement and that the Copelands were entitled to damages, the amount to be decided at a subsequent hearing. In the district court and now on appeal, D & D argues that the Copelands had in fact breached the lease and that D & D should be awarded damages.
The contract, although far from precise in several areas, was found by the trial judge to be legal and to place various obligations on the parties.
Carefully considering the testimony and the extensive documentary evidence, we cannot say that the trial judge erred either in deciding that the lease was binding or in factually finding that D & D had breached the agreement, and we affirm these determinations. The record, however, very distinctly supports a contravention by the Copelands,' and that part of the district court judgment remanding for the assessment of damages for D & D to pay is annulled and set aside.
The subject lease was entered into on July 23, 1979. D & D owned six side-by-side lots at the corner of Causeway Boulevard and 17th Street in Metairie, Louisiana, and the property was leased to the Cope- *1190 lands for use as a restaurant. The lease stated:
“Lessor shall demolish all improvements other than existing slabs and driveways presently on the premises and Lessee will construct on the premises a building or buildings suitable for use as a food operation, provided that Lessee shall furnish all necessary insurance including liability, workman’s compensation, etc. during said construction. Lessor to provide ONE HUNDRED FIFTY THOUSAND AND NO/100 ($150,000.00) DOLLARS cash to construct one (1) 3,000 sq. ft. building; Lessee to pay for any cost overages in excess of ONE HUNDRED FIFTY THOUSAND AND NO/100 ($150,000.00) DOLLARS. Lessor shall provide funding for the $150,000.00 in three stage draws of thirty (30%) percent each and the last draw of 10% to be paid when Lessee provides Lessor with a clean lien and privilege certificate.”
Lease payments by the Copelands to D & D of $4,325.00 monthly were to start eight months after the agreement was executed in March, 1979.
Throughout the seven-day trial in early 1984, there was extensive testimony regarding the respective parties’ understanding of the agreement, but it is clear that D & D was to fund construction of the building only up to $150,000.00, payable in three 30 per cent installments and a final 10 per cent at the end, and that the Cope-lands were to use these funds to erect a 3,000 square foot building. Costs exceeding $150,000.00 were to borne by the Cope-lands.
The contract did not have a construction or a payment schedule, although obviously 90 per cent of the $150,000.00 was to be paid by D & D during construction and 10 per cent upon completion of the structure, and there was no provision as to when, if ever, the Copelands were to submit either a partial or full accounting to D & D.
When the lease was signed, D & D tendered $15,000.00 to the Copelands, the amount requested by them, which amounted to one-third of the initial 30 per cent draw. In late November or early December, 1979, the Copelands began to orally ask for the remainder of the first draw. D & D, however, was reluctant to make further monetary advances because two written requests (on September 5 and October 26, 1979) for plans and specifications of the building had been unsatisfied and also because the first $15,000.00 had not produced any apparent construction progress.
On August 1, 1979, the appellees had opened an account in the name of Copeland Food Systems, Inc. at the Hibernia National Bank with the deposit of D & D’s $15,-000.00 check. Almost immediately, all but $696.77 of this account was used for things not connected with construction of the building on D & D’s property.
In mid-December, 1979, preliminary plans for the building were supplied to D & D. This tender occurred several days or weeks after the Copelands started requesting the second part of the first draw. There were then various discussions and some meetings; and on March 26, 1980 a meeting was held in the law offices of Malcolm Ziegler, D & D’s representative. In attendance were Mr. Ziegler, Mr. Drury, Mr. Copeland Jr. and attorney Henry C. Vosbein Jr., who represented the Cope-lands and who was one-third silent partner in the undertaking. At that time, it was agreed that D & D was to pay two $15,-000.00 checks “ ... in a matter of days ...” The rest of the $150,000.00 was to be paid thusly:
$22,500.00 when framing completed,
$22,500.00 when building blocked in,
$30,000.00 when inside closed in,
$15,000.00 on acceptance, and
$15,000.00 when lien certificates furnished.
For the, first time, D & D and the Cope-lands had agreed on a payment schedule. Accordingly, D & D did forward $30,000.00 to the Copelands but very little construction work was ever done thereafter. Only the slab was completed.
On April 3,1980, Mr. Ziegler forwarded a revised building contract to Mr. Vosbein, *1191 but no action was taken, with regard to this document. A followup letter from Mr. Ziegler to Mr. Vosbein on April 11, 1980 said:
“Pursuant to the meeting held in our offices on March 26th, at which time you, Gil Copeland, Jr., Mark Delesdernier, Jr., Mike Drury and the undersigned were present, and our subsequent telephone conversation on the following day, an agreement was reached relative to the construction and funding provisions of paragraph 8 of the lease and rental payments as provided under paragraph 3 of the lease. These agreements were subject to entering into written modifications, together with building contract relative to construction and financing.
“Pursuant to that, I have previously discussed with you preparation of a building contract under date of April 3rd, I forwarded to you a proposed building contract. In addition to this, my clients have paid unto Copeland Food Systems, Inc., since our meeting, a sum of $30,-000.00 to be applied to construction.
“An inspection of the site indicates that work has come to a standstill and that your clients are not actively pursuing completion of construction of the project. Unless a written amendment to the lease and building contract are entered into within five (5) days, as previously agreed upon, we will have no alternative but demand full payment of the rent in accordance with the provisions of paragraph 3 thereof, and upon failure of your client to timely pay the full amount of said rent to place them in default of the lease.
“Of course, I am hopeful that this will not be necessary, and that we can proceed in accordance with our previous agreements.”
On May 1, 1980, Mr. Vosbein’s letter to Mr. Drury stated, in part:
“Enclosed is Copeland Food Systems, Inc. rent check for the month of May according to our agreement, in the amount of $2,703.13.
“Construction slowed down while they negotiated with you and they lost some key workers.
“They are now moving forward on construction and anticipate completion of the building in approximately 60 days, weather permitting.”
On May 23, 1980, despite the fact that the Copelands owed lease payments for April and May, Lenny R. Zatzkis, the Cope-lands’ new attorney, wrote a letter to D & D, as follows:
“Please be advised that I represent Gilbert E. Copeland in connection with that certain lease executed between you and Mr. Copeland relative to the premises located in Jefferson Parish, designated at Lots 1, 2, 3, 4, 29 & 30 of Square 33 forming the corner of North Causeway Boulevard and 17th Street. In connection with said lease, please be advised that you are currently in default of same due to your failure to deliver to my client on a timely basis, the sum of $150,000.00, in accordance with the provisions of the lease.
“Furthermore, please be advised that you have caused damages to my client in the form of delays in providing funds and causing time delays relative to the erection and construction of the building on the premises. These delays will cost my client additional monies in terms of added construction cost and interest costs over the period of time of construction.
“It is further my understanding that there is not clear title to the property, which also constitutes a breach of the lease.
“It is further my understanding that there have been several meetings and prior attempted modifications of the lease in question, which apparently have not yet been consummated.
“I have been in contact with Malcolm E. Ziegler, who I understand represents you in this matter and I am ready to meet with you, your attorney and my client in an attempt to resolve this matter on an amicable basis, if possible. However, in *1192 the event that we can not resolve these issues on or before May 30,1980, it is my opinion that the only solution to the problem would be litigation.
“It is further my opinion that litigation is not the best solution nor is it in the best interests of any of the parties in this matter and I stand ready to work with you as soon as possible. In the meantime, this letter shall serve as formal notice of default on your part insofar as the lease is concerned.”
Other letters in evidence and voluminous testimony bear witness to the problems that plagued this business venture almost from the moment the lease was executed in July, 1979. The Copelands filed the instant suit on June 2, 1980, alleging, primarily, the refusal of D & D to make draw payments other than for the initial $15,000.00.
In his “Reasons for Judgment,” the trial judge stated:
“Plaintiffs have met their burden of proof by their strong showing that D & D breached the lease agreement by not supplying them with the needed draws. Their breach was numerous and continuous and began in December of 1979 when the Copelands asked for the remaining $30,000.00 of the first $45,000.00 draw. It was not until April 8, 1980 that D & D finally advanced the entire first draw after repeated attempts to collect this draw.”
If the failure of D & D to make draw payments constituted a breach, as the trial judge found, the later (subsequent to March 26, 1980) failure of the Copelands to meet their obligations was likewise a breach. On March 26th, D & D agreed to pay an additional $30,000.00, which it did, while the Copelands were to be paid further in accord with the agreed-on schedule that called for the payment of $22,500.00 when the building’s framing was completed. The record is devoid of any indication that the Copelands went ahead with any serious framing work after March 26, 1980 or that they even contemplated such construction once they received the $30,000.00 payment.
Mr. Vosbein said, in his May 1, 1980 letter to Mr. Drury, that the Copelands “ ... are now moving forward on construction and anticipate completion of the building in approximately 60 days ...” Such optimum was ill founded as the Copelands were not “ ... moving forward ...”
Instead, Mr. Zatzkis, on behalf of the Copelands, sent his May 23, 1980 letter to D & D; and shortly thereafter, suit was filed.
Mr. Drury testified that in June, 1980, he was telephoned by Mr. Copeland Sr., who said, according to Mr. Drury:
“ ... that they thought — when I say ‘they,’ I would have to say that he was speaking on behalf of all parties, his son, and Henry Vosbein, that they thought it would be in the best interest of everyone at this point not to go through with the construction because of the fact that his son ... was having his own problems financially ...”
Mr. Copeland Sr., Mr. Drury testified, added that he didn’t think his son “ was capable of running the operation ... and that he’d like to find another tenant for the property.”
Mr. Drury stated that yet another meeting took place, attended by Mr. Copeland Sr., Mr. Vosbein and Mr. Drury. Mr. Dru-ry testified:
“All parties agreed that they would attempt to locate a new tenant for the property in order to mitigate the damages for which the Copelands would be responsible if they withdrew.”
LSA-C.C. art. 1934[1] deals with the measure of damages for contract breach. Paragraph 4 of this article reads:
“If the creditor be guilty of any bad faith, which retards or prevents the execution of the contract, of if, at the time of making it, he knew of any facts that must prevent or delay its performance, and concealed them from the debtor, he is not entitled to damages.”
*1193 It appears irrefutable from this record that the Copelands, after the March 26, 1980 accord and before and after they accepted the final $30,000.00 payment, knew that they would not earnestly go ahead with framing of the building. Such bad faith would necessarily preclude the awarding of damages to them.
It is well settled that one cannot claim damages under a contract until and unless he has showed his full compliance with the terms thereof. See Edington Drilling Company v. Yearwood, 239 La. 303, 118 So.2d 419 (1960), Mandina v. Fulco, 43 So.2d 310 (La.App. 2nd Cir.1949), and other cases.
We remand to the 24th Judicial District Court for whatever further proceedings are deemed appropriate, with each party to bear its respective costs of this appeal.
AFFIRMED IN PART, REVERSED IN PART AND REMANDED.

. Reproduced in part in LSA-C.C. art. 2003, which became effective January 1, 1985.