**In re ORION REFINING CORP., Debtor.**

**Michael G. Syracuse d/b/a Interstate Supply Co., and Texas Ico, Inc., Plaintiffs,**

**v.**

**Orion Refining Corp., Defendant.**

**Bankruptcy No. 03–11483.
Adversary No. 03–53939.**

United States Bankruptcy Court,
D. Delaware.

Feb. 5, 2010.

Andrew C. Wilson, Simon Peragine, Smith & Redfearn, LLP, Los Angeles, CA, Christopher Martin Winter, Michael R. Lastowski, Richard W. Riley, Duane Mor-

ris LLP, Dennis A. Meloro, Greenberg Traurig, Wilmington, DE, for Plaintiffs.

Thomas W. Briggs, Gregory W. Werkheiser, Morris Nichols Arsht & Tunnell, Victoria Watson Counihan, Greenberg Traurig, LLP, Wilmington, DE, for Defendant.

## OPINION [1]

MARY F. WALRATH, Bankruptcy Judge.

Before the Court is the Complaint of Michael G. Syracuse d/b/a Interstate Supply Company and Texas ICO, Inc. ("Syracuse") against Orion Refining Corporation ("Orion") seeking damages in excess of $3 million for Orion's conversion of Syracuse's property. Orion counterclaims for breach of contract. After trial and briefing, the Court concludes that Syracuse is entitled to judgment against Orion for $156,342.87 representing the value of the property converted. Although the Court finds that Syracuse breached the parties' contract, Orion failed to prove any damages for that breach. Accordingly, the Court will direct that Orion pay Syracuse $156,342.87 plus pre– and post-judgment interest from the escrow established by this Court's June 26, 2003, Order and that the balance of the escrow be paid to Orion.

## I. BACKGROUND

Orion operated a crude oil refinery in Norco, Louisiana (the "Refinery"). (FOF 17–18.) Orion decided to sell the Refinery in 2002. (FOF 22.) To prepare the Refinery for sale, Orion sought to dispose of certain equipment, scrap, and other material (the "Surplus Material") located in sev-

enteen areas of the Refinery (the "Designated Areas"). (FOF 23–25, 43–44.)

Effective April 24, 2001, Syracuse and Orion entered into a contract (the "Agreement") whereby Syracuse purchased and agreed to remove the Surplus Material located in the Designated Areas and to clean those areas of the Refinery. (FOF 32, 36–39, 43–44.) Syracuse paid Orion $100,000 for the Surplus Material. (FOF 36.)

After executing the Agreement, Syracuse removed all of the new Surplus Material from the Refinery to his own facility where he put it in stock for future sale. (FOF 72.) Syracuse sold other Surplus Material from the Refinery site for more than $500,000. (FOF 71, 73–76.) Under the Agreement, Syracuse had until March 31, 2002, to complete the removal of the Surplus Material. (FOF 42.) Syracuse did not complete the work by that date and was not permitted back into the Refinery thereafter. (FOF 86–87.)

On May 13, 2003, Orion filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. (FOF 1.) Shortly after the bankruptcy filing, Orion filed a motion for bid procedures and authority to sell the Refinery and all related assets to Valero Energy Corporation and Valero Refining–New Orleans, LLC (collectively "Valero"). (FOF 2.) Syracuse objected to that sale to the extent it included the Surplus Material that he claimed he owned. (FOF 3.) The objection was resolved and the Court permitted the sale to proceed, subject to Orion placing $1.5 million [2] of the sale proceeds in an interest-bearing es-

---

1. This Opinion and the accompanying Findings of Fact ("FOF") constitute the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052.

2. The escrow was based on an appraisal ("the Rosen Report") that Syracuse had obtained which was attached as an exhibit to his objection to the sale. (See Bankr.Docket No. 268, Ex. B at 103.)

crow pending a determination of Syracuse's claim. (FOF 4.)

Syracuse filed a complaint against Orion seeking, inter alia, damages for conversion of the Surplus Material. (FOF 5.) Orion filed an answer, affirmative defenses, and counterclaims based, inter alia, on allegations that Syracuse breached the Agreement by failing to remove the Surplus Material by March 31, 2002. (FOF 6.)

In prior decisions, it has been determined that the Surplus Material was in fact still at the Refinery on the date of the sale to Valero and that Syracuse had obtained title to the Surplus Material under applicable state law at the time the Agreement was executed. (FOF 7–8, 12.)

Trial was held on June 16, 17 and 18, 2009, to determine (1) the amount of damages, if any, suffered by Syracuse as a result of the sale by Orion to Valero of the Surplus Material previously bought by Syracuse and (2) whether Syracuse had breached the Agreement and, if so, the amount of any resulting damages suffered by Orion. (FOF 14–15.)

Post-trial briefs were completed on September 4, 2009. (FOF 16.) The matter is ripe for decision.

## II. *JURISDICTION*

This Court has jurisdiction over this adversary proceeding, which is a core proceeding pursuant to 28 U.S.C. §§ 1334 & 157(b)(2)(A), (B), (C), (M), (N), & (O).

## III. *DISCUSSION*

### A. *Syracuse's Claims*

#### 1. *Conversion of the Surplus Material*

Syracuse asserts that he is entitled to a judgment for damages suffered by him for Orion's conversion and failure to turn over

**3.** The parties agree that the Agreement is governed by Louisiana law. (*See* Adv. Docket

the Surplus Material. Syracuse claims damages equal to the value of the remaining Surplus Material he bought (which he asserts exceeds the escrowed funds).

■ Under Louisiana law,[3] a conversion is any "act in derogation of the plaintiff's possessory rights, and any wrongful exercise or assumption of authority over another's goods, depriving him of the possession, permanently or for an indefinite time." *See, e.g., Quealy v. Paine, Webber, Jackson & Curtis, Inc.,* 475 So.2d 756, 760 (La.1985).

■ It has been determined that Syracuse owned the Surplus Material as of the time he signed the Agreement. *Syracuse v. Orion Ref. Corp.,* No. 06–536–SLR, 2008 WL 975071, at *3 (D.Del. Apr.9, 2008). Because Orion refused to allow Syracuse possession of the remaining Surplus Material after the Agreement expired and sold that Surplus Material to Valero, the Court finds that Syracuse has established a claim for conversion on April 1, 2002, when he was prevented from removing the remaining Surplus Material from the Refinery. (FOF 87.)

■ Syracuse admits that normally damages for conversion are determined as of the date of the conversion of the property. *See, e.g., Quealy,* 475 So.2d at 761 ("The traditional damages for conversion consist of the return of the property itself, or if the property cannot be returned, the value of the property at the time of conversion."). *See also Dual Drilling Co. v. Mills Equip. Inv., Inc.,* 721 So.2d 853, 858 (La.1998) (finding party liable for value of property in its depreciated condition at time of conversion); *Boisdore v. Int'l City Bank & Trust Co.,* 361 So.2d 925, 931 (La.Ct.App.1978) (same).

No. Adv. at 38, n. 54; Docket No. 219 at 27–28.)

Syracuse contends, however, that the traditional damage award will not make him whole, because the value of scrap metal was depressed at the time of conversion but that he would have been able to sell it later when prices rebounded. Therefore, he asserts that he is entitled to the value of the Surplus Material in 2008 or 2009 when scrap prices recovered. *See, e.g., Quealy,* 475 So.2d at 762 (determining that the proper date for valuation of converted stock was trial date because the value fluctuated and the general rule would not make the plaintiff whole); *Succession of Gragard,* 106 La. 298, 30 So. 885, 888 (1901) ("Considering that the cotton was being held for better prices, we think that the owners of it should be given the benefit of the better prices that prevailed within a few months afterward.").

Orion responds that the period suggested by Syracuse (2008–2009) is too remote from the conversion which occurred on April 1, 2002, and that the traditional measure of damages must be applied. *See, e.g., Womack v. Sternberg,* 247 La. 566, 172 So.2d 683, 686 (1965) (holding that "the measure of damages for the breach of a contract of sale, where no fraud is shown, is the difference between the contract price and the market price of the goods on the Date of the breach."). *See also Lockhart v. Sutton,* 503 So.2d 1046, 1048 (La.Ct.App.1987) (affirming disallowance of damages calculated by difference in price from time of breach of agreement of sale and time property was sold because damages are determined at time of conversion, not thirteen months later).

The Court agrees with Orion that the relevant date for determining damages is the actual date of conversion. The case of *Friedman Iron & Supply Co. v. J.B. Beaird Co., Inc.,* 222 La. 627, 63 So.2d 144, 149 (1952) is particularly instructive. That case also involved the breach of an agreement to buy scrap. 63 So.2d at 146. The *Friedman* Court originally denied any award of damages to the seller because the price of scrap had increased between the time of the breach and the trial so that the seller was actually in a better position than if the contract had been fulfilled. *Id.* at 148. On rehearing, however, the Court reversed and held that the seller was entitled to damages measured as of the date of breach of the contract. *Id.* at 151. The Court reasoned that to chose any other date would cause uncertainty (because it depended on future events) and perhaps cause the parties "to jockey for a trial on a date when the market was favorable." *Id.* at 150. The Court therefore applied the traditional rule and determined damages based on the date of the breach "because neither a plaintiff nor a defendant should be permitted to select the market value of a date different from that on which the contract was breached for the purpose of determining whether any loss was suffered or profit deprived to the detriment of either party." *Id.* at 149.

Similarly, the Court concludes that Syracuse is only entitled to damages for the conversion measured by the value of the Surplus Material remaining at the Refinery on the conversion date of April 1, 2002. *See also, Quealy,* 475 So.2d at 760; *Womack,* 172 So.2d at 686; *Leurey v. Bank of Baton Rouge,* 131 La. 30, 58 So. 1022, 1026–27 (1922) (declining to follow courts which have held that converted stock should be valued at trial date rather than conversion date because there was no bad faith).[4]

### 2. *What Surplus Material Remained*

A critical element of Syracuse's case is what Surplus Material was actually at the Refinery when the conversion occurred on

---

4. In this case the Court finds that Orion did not act in bad faith. (FOF 181–218.)

April 1, 2002. The parties never created an inventory of the Surplus Material which Syracuse bought or an inventory of the Surplus Material remaining at the Refinery at the expiration of the Agreement. (FOF 88.) Therefore, Syracuse sought to establish what Surplus Material remained at the Refinery on April 1, 2002, by other means.

At trial, Syracuse offered photos of what he stated was the Surplus Material remaining at the Refinery on April 1, 2002. (FOF 91.) The Court finds that proof lacking for several reasons. First, the witness who sought to authenticate the photos, Syracuse, did not in fact take them; his son did and Syracuse was not present when they were taken. (FOF 92.) Second, many of the photos are of equipment that Syracuse acknowledged had been sold and removed before April 1, 2002, or that Syracuse had never bought. (FOF 93–94.) Finally, there were many duplicate photos of the same equipment.[5] (FOF 95.)

Syracuse's expert, Mark Israel, did construct a partial list of the Surplus Material at the Refinery on March 1, 2002, in connection with his preparation of the Rosen Report. (FOF 89.) The Rosen Report, however, is not a complete or accurate listing of the Surplus Material remaining at the Refinery as of April 1, 2002, because Israel did not survey all of the Designated Areas but was limited to just four areas (Section 3, Auction Yard, East Yard and New Sarpy Yard). (FOF 89.) In addition, Syracuse continued to sell Surplus Material after Israel's inspection so that, like the photos, the Rosen Report cannot be considered an accurate list of the Surplus

Material remaining as of April 1, 2002. (FOF 90.) Nevertheless it is at least a representative list of the type of Surplus Material that had been at the Refinery at the time that the conversion occurred.

### 3. Value of the Remaining Surplus Material

■ Fair market value is the price for property agreed upon "between a willing and informed buyer and a willing and informed seller under usual and ordinary circumstances; it shall be the highest price estimated in terms of money which property will bring if exposed for sale on the open market with reasonable time allowed to find a purchaser who is buying with knowledge of all the uses and purposes to which the property is best adapted and for which it can be legally used." La.Rev. Stat. Ann. § 47:2321. See also, Warren Energy Res., Inc. v. Louisiana Tax Comm'n, 825 So.2d 572, 575 (La.Ct.App. 2002) (finding that tax assessors must determine the fair market value of property in accordance with that section); Adm'rs of Tulane Educ. Fund v. Johnson, 784 So.2d 769, 771–72 (La.Ct.App.2001) (fair market value can be determined by using the market approach, the cost approach, or the income approach).

The American Society of Appraisers ("ASA") defines highest and best use, which certified ASA appraisers must determine, as: the most probable and legal use of a property, which is physically possible, appropriately supported, financially feasible, and results in the highest value. (FOF 110.)

---

5. The Court believes that the inclusion of duplicate photos and photos of material that had already been sold and removed by Syracuse or did not belong to Syracuse was an effort to mislead the Court into believing that there was much more Surplus Material remaining at the site as of April 1, 2002, than in fact

there was. Even if that is not the case, the inclusion of hundreds of duplicative and irrelevant photos in one exhibit in a disorganized fashion certainly did not assist the Court in determining what equipment actually remained at the Refinery on April 1, 2002, or what its true condition was at that time.

In this case, Syracuse (a willing buyer) agreed to pay Orion (a willing seller) $100,000 in exchange for all of the Surplus Material in March 2001. (FOF 36, 111.) He removed all of the new material (including pipe, valves and fittings) to his facility for later resale and sold much of the Surplus Material in the eleven months he was on site for $500,000. (FOF 71–76.)

Syracuse contends that the value of the remaining Surplus Material nonetheless exceeds $1.5 million because it must be calculated at the value to him. That is, he argues that it must be valued at the price which he, as a scrap and used equipment dealer, could realize by reselling it. To prove that value, he presented the testimony and report of Israel,[6] who testified that a dealer such as Syracuse could have realized $1,591,150 by selling the Surplus Material over a period of five years.[7] (FOF 168.)

▪ Syracuse also argues that the Court should consider offers he received for some of the Surplus Material that he says was not valued in the Rosen Report (totaling $275,000) as evidence of the value of the remaining Surplus Material. (FOF 123–24.) However, the Court rejects these offers as they are not competent evidence of the value of that equipment because the sales were never completed and at least one of them appears to be included in the Rosen Report (at a value of $5,000). (FOF 123–25.)

Because of his lack of qualifications as an appraiser, the Court finds Israel's opinion of the value of the remaining Surplus Material to be unconvincing. Even if Israel had qualified as an expert, the Court does not credit his opinion of the value of the remaining Surplus Material for several reasons. First, Israel valued the remaining Surplus Material from the point of view of what a used equipment dealer could *receive* on resale of the equipment, which could take up to five years. (FOF 115–16.) Such an extensive time is neither consistent with the Agreement nor with the definition of fair market value. The Agreement required that the Surplus Material be removed from the Refinery within one year. (FOF 42.) In fact, much of the Surplus Material was removed and sold by Syracuse within that period. (FOF 68–76, 146.)

Further, Israel's valuation assumed that the equipment could be sold for reuse not for scrap. (FOF 117.) Israel admitted that used equipment dealers such as Syracuse took the risk that material they bought could not be repaired and had to be sold as scrap. (FOF 118.) Nonetheless, he valued the Surplus Material as usable equipment, at the direction of Syracuse, without making any determination himself that the equipment was in working order or could be repaired. (FOF 117, 121–22.) There is no evidence that Syracuse could have realized such values from the remaining Surplus Material; instead, from the evidence presented, Syracuse was often able to receive only scrap value for the Surplus Material. (FOF 73–76.) Even

---

6. Israel was not a qualified appraiser and was not able to make a determination of the highest and best use of the Surplus Material. (FOF 98, 100.) As a result of voir dire, Israel was not offered as a certified appraiser but only as a person with experience in the used equipment industry. (FOF 101.)

7. Syracuse also asserted (in his post-trial brief) that the Surplus Material that was not seen or valued by Israel is worth at least $800,000 as scrap. There is no record reference or indication in the brief, however, of how that figure is derived. Because the Court concludes that all of the Surplus Material must be treated as scrap and includes the weight of all of the Surplus Material in determining the damages due to Syracuse, the Court concludes that this claim is duplicative.

where Syracuse sold the Surplus Material as usable equipment, he got lower prices than the Rosen Report indicated. (FOF 74, 122.)

Finally, Israel did not consider the cost of "carrying" or storing the equipment for the time it would take a used equipment dealer such as Syracuse to sell it. (FOF 116.) Early in the course of his work, Syracuse removed to his own premises all of the new Surplus Material and all of the types of material that he typically sold. (FOF 72.) What remained at the Refinery were huge vessels and equipment that required heavy equipment to move. (FOF 28–29.) The Court concludes that Syracuse did not remove the remaining Surplus Material because the cost of removal and storage was prohibitive in light of its value.

Orion's expert, James Harden, testified that the remaining Surplus Material was scrap that was worth only $93,390. (FOF 169.) Harden was a certified appraiser and an expert in the oil and gas field with eminent qualifications. (FOF 102–03.) His opinion of the value of the remaining Surplus Material was thorough and convincing.

Syracuse contends that Harden's testimony was fallacious because it evaluated all of the Surplus Material at scrap value, ignoring that fact that Syracuse had been able to sell much of the Surplus Material as replacement equipment for a much higher value. However, Harden was convincing when he opined that Syracuse had already sold all of the valuable material that he was able to sell as replacement equipment and that what remained was mere scrap. (FOF 126–27.) Just as with any "yard sale" the good items are sold

early leaving behind the less valuable items.[8] (FOF 126–29.)

Syracuse had a year to sell the Surplus Material and there is evidence that he sold many pieces as usable equipment. (FOF 72. 74–75.) However, even Syracuse sold much of the Surplus Material at scrap values. (FOF 73.) Therefore, the Court finds that by the expiration of the Agreement the remaining Surplus Material was used, old and unable to be sold easily. The Court concludes that the highest and best use of the Surplus Material remaining at the Refinery on the date the Agreement expired was for its metallic content only, i.e., for scrap.

### a. Weight of the Remaining Surplus Material

Scrap metal is sold by gross tons.[9] To determine the weight of the remaining Surplus Material, the various experts relied largely on the Rosen Report's description of the material and the manufacturers' specifications. (FOF 131–34.) Where weights could not be ascertained that way, the experts estimated the weight. (FOF 132–36.)

Orion's expert, Harden estimated the remaining Surplus Material weighed 4.6 million pounds by assuming the vessels for which weight was not known had the same thickness (.5 inches) as the median thickness of the known vessels. (FOF 132–33.)

Syracuse's expert, Bradshaw performed a linear regression analysis on the thickness of the known vessels and determined that the thickness of the unknown vessels was 2.5 inches. (FOF 137–38.) He, therefore, concluded that the weight of the re-

---

8. Harden stated that "the good stuff goes first and what is left over is continually marked down until you call a scrap dealer to sell it for its material content." (FOF 127.)

9. A gross ton is calculated using 2,240 pounds per ton, rather than the standard 2,000 pounds per ton and is used in the scrap industry because of the shrinkage that occurs in the melting process. (FOF 130 n. 5.)

maining Surplus Material was 9.2 million pounds. (FOF 141.) However, Bradshaw's linear regression analysis suggested a weight for the unknown vessels that was no where near the average (1.88 inches) or median (.63) weight of the known vessels and gave undue consideration to several extraordinarily thick vessels (11 inches). (FOF 138–40.) Rather than being representative of the vessels that were known, the least squares linear regression analysis done by Bradshaw appears to be a random line drawn through the data and not representative at all of the vessel thicknesses. (FOF 139.) Consequently, the Court finds unconvincing Bradshaw's testimony on the weight (and therefore value) of the remaining Surplus Material.

Instead, the Court finds most convincing the evidence of the weight of the Surplus Material that was determined contemporaneously. In July 2002, a third party (PSC Metals, Inc.) inspected the Surplus Material and estimated that it totaled 5,000–6,000 gross tons of ferrous scrap metal and a small quantity of non-ferrous material. (FOF 145.) After that date, Syracuse admittedly sold 1,611.678 gross tons of ferrous scrap, 7.595 tons of non-ferrous stainless steel, and 25.563 tons of brass. (FOF 146.) After the Agreement expired and Valero bought the Refinery, Valero removed 4,182.18 gross tons of ferrous scrap, 6.76 gross tons of non-ferrous stainless steel, and no brass from the Refinery. (FOF 147.) The sum of the sales by Syracuse and Valero (5,793.778 and 39.918 gross tons of ferrous and non-ferrous scrap, respectively) comports with PSC's estimate.

Further the Court has already determined (on Syracuse's motion for partial summary judgment) that all of the Surplus Material that was at the Refinery on April 1, 2002, was sold by Orion to Valero.

(FOF 7–8.) Therefore, the Court concludes that there was 4,182.18 gross tons of ferrous scrap and 6.76 gross tons of non-ferrous scrap at the Refinery at the time that the Agreement ended and the Surplus Material was converted by Orion.

b. *Scrap Prices*

Harden stated that the consumer price for ferrous metal was $55.66 per gross ton as of March 1, 2002. (FOF 152.) Reducing that price for processing and transportation, Harden concluded that the actual market price (for a scrap dealer like Syracuse) for ferrous metal was $33.40 per gross ton. (FOF 153.)

Syracuse's rebuttal expert, Friederichsen, testified that the price for ferrous metal was $59.33 per gross ton after deducting $40 per gross ton for processing costs. (FOF 154.) That figure, however, still contained a $22.50 premium per gross ton for "quality" suppliers of scrap metal which he admitted Orion was not. (FOF 154–55.) As a result, the Court finds that Friederichsen's net price for ferrous metals in March 2002 was $36.84.

Therefore, the Court finds that as of April 1, 2002, the ferrous scrap remaining at the Refinery had a value of $154,071.51 ($36.84 × 4,182.18). (FOF 160–61.)

Similarly, Harden opined that the non-ferrous scrap (largely stainless steel) had a market value as of March 2002 of $263.51 per gross ton. (FOF 162.) Friederichsen, opined that the value of the non-ferrous scrap as of March 2002 was $585 per gross ton after processing fees. (FOF 163.) Friederichsen's company Southern Scrap, however, actually purchased stainless steel scrap from Syracuse for $313.60 and $336.00 per gross ton during 2001 and 2002. (FOF 164.) Therefore, the Court finds that the scrap market price for stainless steel was $336 per gross ton as of April 1, 2002. (FOF 166.)

Accordingly, the Court finds that as of April 1, 2002, the value of the remaining 6.76 gross tons of non-ferrous Surplus Material was $2,271.36 (6.76 × $336). (FOF 167.) Therefore, the Court concludes that as of April 1, 2002, the value of all of the remaining Surplus Material was $156,342.87 ($154,071.51 + $2,271.36). (FOF 170.)

#### 4. *Damages for Tag Removal*

■ Syracuse also argues that he is entitled to damages for Orion's removal of the tags and name plates from the vessels sold to him. (FOF 171–72.) He contends that by removing the tags, Orion destroyed their value as usable equipment and rendered them salable only as scrap. (FOF 173.) Syracuse asserts that the measure of his damage is the difference in value before the damage to the property (the usable equipment value reflected on the Rosen Report) and the value (as scrap) after the damage to the property. *See, e.g., Roman Catholic Church of the Archdiocese of New Orleans v. La. Gas Serv. Co.*, 618 So.2d 874, 879 (La.1993) (concluding that damages may include cost of restoration of the property to its original condition or, if that is economically wasteful, the difference in value of the property before and after the harm).

Orion asserts that Syracuse's claim for damages resulting from the removal of the tags must be denied because Syracuse failed to mitigate those damages. La. Civ. Code Ann. art. 2002 (a contracting party "must make reasonable efforts to mitigate" damages caused by another's breach of contract). *See also Elliott v. Normand*, 976 So.2d 738, 745 (La.Ct.App.2008) (denying storage charges for boat where party failed to mitigate its damages by not acting promptly to get boat repaired). *Cf. Rogers v. Nelson Dodge, Inc.*, 407 So.2d 443, 447 (La.Ct.App.1981) (holding that party did not fail to mitigate his damages by not repairing motor home because evidence proved it could not be repaired).

After Syracuse complained to Orion about the removal of the tags, Orion stopped doing so and returned all of the tags to Syracuse. (FOF 175.) Syracuse did not dispute that he had all of the original tags (in fact, he introduced copies of them into evidence). (FOF 175.) Orion offered to have the tags reattached by its contractor, but Syracuse never accepted that offer or arranged to have the tags reattached himself. (FOF 176.)

Because Syracuse took no steps to reattach the certification plates, the Court finds that he failed to mitigate his damages. Therefore, the Court concludes that Syracuse is not entitled to any damages related to the removal of the certification tags. La. Civ.Code Ann. art. 2002 (a contracting party "must make reasonable efforts to mitigate" damages caused by another's breach of contract).

### B. *Orion's Breach of Contract Claim Against Syracuse*

#### 1. *Bar to Recovery of Damages by Syracuse*

■ The core of Orion's affirmative defenses is that Syracuse cannot recover on his claim because he breached the Agreement while Orion fully performed. *See, e.g., B.F. Edington Drilling Co. v. Yearwood*, 239 La. 303, 118 So.2d 419, 422 (1960) (concluding that party that installed well could not obtain payment of the contract price because the well did not meet the contract specifications); *City of Houma v. C–Well Ltd.*, 515 So.2d 646, 648 (La.Ct.App.1987) (holding that party may not recover damages for breach of contract where its own bad faith caused the other party's breach); *Copeland v. Drury*, 494 So.2d 1189, 1193 (La.Ct.App.1983) (holding that a party cannot claim damages for breach of contract unless he has shown his

full compliance with the contract and is not acting in bad faith).

While this may preclude relief on Syracuse's breach of contract claim, Syracuse is also seeking relief under a conversion theory. (FOF 5.) As noted, the District Court concluded that title to the Surplus Material passed to Syracuse at the time the Agreement was executed. (FOF 12.) The Court, therefore, concludes that the later breach of the contract by Syracuse does not preclude recovery by him under a conversion theory for the value of the remaining Surplus Material that he owned.

### 2. *Counterclaim for Damages*

Orion also argues that it is entitled to damages for Syracuse's breach of contract which may offset any damages for conversion to which Syracuse is entitled.

■ The Agreement was a valid contract. *See* La. Civ.Code Ann. art. 1918, 1927, 1971, & 1973 (a valid contract exists where (i) the parties are legally capable of contracting, (ii) consent by parties is legally given, (iii) a certain object forms the matter of the parties' agreement, and (iv) there exists a lawful purpose for the contract); La. Civ.Code Ann. art. 1906 ("A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished.").

Valid contracts have the force of law as between the parties. La. Civ.Code Ann. art. 1983. *See also, Good v. Saia*, 9 So.3d 1070, 1074 (La.Ct.App.2009) (noting that "it is well-settled that contracts have the force of law between the parties").

■ When a party refuses to perform an obligation under a contract, the party is in default and has breached the contract. *See, e.g., Eota Realty Co. v. Carter Oil Co.*, 225 La. 790, 74 So.2d 30, 35 (1954) (defendants' refusal to drill breached the contract and other party was not required to formally put them in default); *Andrew*

*Dev. Corp. v. W. Esplanade Corp.*, 347 So.2d 210, 212–13 (La.1977) (noting that where party refuses to perform, as opposed to failing to perform or neglecting to comply with the contract, he is in active breach of the contract relieving the other side of its performance); *Gulf Coast Bank & Trust Co. v. Rick Granger Enters.*, 800 So.2d 402, 404–05 (La.Ct.App.2001) (a party's refusal to comply with his contractual obligation constitutes an active—anticipatory—breach of the contract).

■ If a party partially performs an obligation or performs it in an unacceptable manner, the party has breached the contract. *See, e.g., Brown v. Brian Riley Bar Transp., LLC,* 986 So.2d 901, 904 (La.Ct.App.2008) (failure to perform in a "workmanlike manner" is a breach of contract); *H & H Concrete, Inc. v. Civicon, Inc.*, 533 So.2d 1294, 1297–98 (La.Ct.App. 1988) (finding plaintiff in breach of contract when he unilaterally ended performance before the contract had expired because his insurance costs had increased). Every contract must be performed in good faith under Louisiana law. La. Civ.Code Ann. art. 1759 & 1983. *See also Payne v. Hurwitz,* 978 So.2d 1000, 1006 (La.Ct.App. 2008) (holding that parties to contract have "an implied obligation to put forth a good faith effort to fulfill the conditions of the contract"); *N–Y Assocs., Inc. v. Board of Comm'rs of Orleans Parish Levee Dist.,* 926 So.2d 20, 24 (La.Ct.App.2006) (noting that "[b]ad faith is not the mere breach of faith in not complying with a contract, but a designed breach of it from some motive of interest or ill will.").

■ Syracuse admits that he did not remove all of the Surplus Material from the Refinery by March 31, 2002. (FOF 86.) Therefore, the Court finds that Syracuse breached the Agreement. The Court also finds that Syracuse failed to perform

the Agreement in good faith by refusing to hire additional labor and cutting subcontractors when he knew that he did not have sufficient labor or equipment to complete the removal of the Surplus Material timely. (FOF 65–67, 77–80, 83–84.) Instead, Syracuse removed and sold the higher value Surplus Material to reap as much profit as possible before the expiration of the Agreement. (FOF 71.)

Syracuse raised several defenses to the breach of contract claim, including that he was prevented from completing the work because the Surplus Material was contaminated, that his work was impeded by Orion's restricting him to one work area at a time, and that Orion removed some of the Surplus Material that Syracuse had bought. In essence, Syracuse contends that Orion breached the Agreement and did so in bad faith.

### a. Contamination

██ Syracuse contends that he was led to believe that all of the Surplus Material that he bought was free of contamination and ready to be removed. (FOF 181.) This is contrary, however, to the express language of the Agreement. (FOF 183.) Syracuse was aware of the provision in the Agreement dealing with how contaminated material would be handled because he added an exhibit to the Agreement which listed what he would charge if he was required to decontaminate the material. (FOF 184.)

██ The Agreement had an integration clause which precludes Syracuse from claiming now, after the fact, that the parties had a different agreement. (FOF 34.) An integration clause in a written agreement bars a party from explaining, contradicting, varying, adding to, or subtracting from the terms of the agreement with prior oral agreements or understandings. *See Condrey v. SunTrust Bank of Georgia,* 429 F.3d 556, 564 (5th Cir.2005) (construing Louisiana law and concluding that an integration clause proves there is no "missing material provision" on which to offer parol evidence); *Henning Constr., Inc. v. First Eastern Bank and Trust Co.,* 635 So.2d 273, 276 (La.Ct.App.1994) (upholding trial court's finding that integration clause precluded finding of genuine issue of fact as to parties' intentions).

██ That bar is especially strong where the parties made changes to a written agreement because it is presumed that other changes would have been made as well if the parties had intended those changes to be part of their agreement. *See Baton Rouge Sash & Door Co., Inc. v. Saale,* 298 So.2d 115, 118 (La.Ct.App.1974) (concluding that where parties had changed written contract for some terms, but failed to change for others, written terms control and parties cannot rely on prior verbal discussions). In this case, Syracuse modified the Agreement (by adding an exhibit for hazardous removal costs) on the exact issue for which he seeks to introduce parol evidence different from the terms of the written Agreement. (FOF 184.) If in fact, as Syracuse asserts, Orion represented that all of the Surplus Material was decontaminated, there would have been no reason for Syracuse to give Orion a quote on the cost he would charge to do that work.

██ Therefore, the Court concludes that Syracuse was aware of the possibility that the Surplus Material was contaminated and cannot now argue that the fact that some of the Surplus Material was contaminated prevented him from performing his obligations under the Agreement.[10]

---

10. Even if parol evidence on this point was admissible, the Court did not find credible

Syracuse's self-serving assertions that he was

Further, the facts established that the contamination of the Surplus Material did not, in fact, prevent Syracuse from performing under the Agreement. First, not all of the Surplus Material was contaminated. (FOF 187.) Syracuse came on site and sold much of the Surplus Material, totally cleaning six of the Designated Areas. (FOF 71–76, 85.) Second, Orion did decontaminate many of the vessels and other equipment, releasing them to Syracuse for removal. (FOF 188–89, 191–94, 196.) Syracuse's failure to remove those vessels (many of which were released in October 2001) by March 2002 was a breach of the Agreement which is not excused. (FOF 196–98.) Therefore, the Court concludes that the fact that some of the Surplus Material was contaminated does not provide a defense to Orion's claim that Syracuse breached the Agreement.

### b. *Work Area Restrictions*

Although Syracuse testified that Orion refused to allow him to work in more than one area at a time, the Court does not find that testimony credible. (Tr. 1, 201:2–14, 204:6–23; Ex. D–4; Ex. P–10.) At the inception of the Agreement, the parties met and it was agreed that Syracuse could work in more than one Designated Area at a time. (FOF 46–53, 200.) The parties prepared a written plan that indicated where Syracuse intended to work and what the start/end dates were in each Designated Area. (FOF 46–53, 201.) That plan shows Syracuse did work in many Designated Areas at the same time. (FOF 49–51.)

The Agreement provided, however, that Syracuse would be subject to the safety procedures and requirements of Orion. (FOF 206–07.) These procedures included the requirement that all workers pass the local safety test, attend daily safety briefings by Orion, and obtain work permits for the areas in which they were working. (FOF 207–14.) These same procedures were applied by Orion to all outside contractors at the Refinery. (FOF 215.)

Therefore, the Court concludes that Syracuse was not restricted from where he could work, other than ordinary restrictions necessary to protect the safety of other workers at the Refinery. These restrictions were in conformity with the Agreement and do not provide a defense to Orion's breach of contract claim against Syracuse.

### c. *Missing Material*

 Syracuse also asserts as a defense that when he arrived at the Refinery, he found some of the Surplus Material that he had bought was missing. (FOF 216.) However, Orion paid Syracuse for the missing equipment. (FOF 217.) Therefore, the Court finds that Syracuse suffered no damage by the failure of Orion to deliver the missing material and it provides no defense to Orion's breach of contract claim against him.

### 3. *Amount of Damages*

### a. *Barred by Bad Faith Breach of Contract*

Syracuse also argues that Orion may not collect any damages for Syracuse's breach of contract because Orion itself breached the Agreement and acted in bad faith. *See, e.g., B.F. Edington Drilling Co.*, 118 So.2d at 422; *City of Houma*, 515 So.2d at 648; *Copeland v. Drury*, 494 So.2d at 1193. However, the Court finds that Orion did not breach the Agreement or act in bad faith. (FOF 181–218.) Therefore, there is no bar to Orion recovering any damages it can prove arising from Syracuse's breach of the Agreement.

told that none of the Surplus Material was

contaminated.

Orion contends that after Syracuse failed to complete the Agreement, it incurred costs cleaning the Auction Yard and other Designated Areas. Orion presented a spreadsheet and backup invoices totaling $130,198.84 purporting to represent the costs incurred in connection with the Auction Yard. (FOF 220.) The vast majority of the invoices and other detail, however, show those costs were for ordinary plant maintenance, cutting the grass, rental of scaffolding and other unrelated equipment, road repairs, fence removal, and services performed for Orion by contractors in other parts of the Refinery. (FOF 221.) None of those costs Orion incurred were related to the obligations of Syracuse under the Agreement (to remove the Surplus Material and clean up the site so that the grass could be cut[11]). (FOF 36–39.) Consequently, the Court concludes that Orion is not entitled to recover the $130,198.84 it seeks for cleaning the Auction Yard.

Orion was unable to present any evidence supporting costs relating to cleaning any area other than the Auction Yard. (FOF 222.) Further, although Orion had initially asserted an additional $209,000 in damages (arising from a proof of claim filed by Valero for clean-up costs Valero had allegedly incurred after the sale closed), Orion did not present any evidence of those or any other damages at trial. (FOF 222.)

Therefore, the Court concludes that Orion has failed to establish any damages for Syracuse's breach of contract. Its counterclaim will therefore be denied.

### C. *Syracuse's Demand for Pre–Judgment Interest*

Syracuse also seeks pre-judgment interest under Louisiana law. The Agreement does not have any provision for interest. (Ex. P–1.) Interest is nonetheless recoverable under Louisiana law. *See* La. Civ.Code Ann. art. 2000 ("When the object of the performance is a sum of money, damages for delay in performance are measured by the interest on that sum from the time it is due, at the rate agreed by the parties or, in the absence of agreement, at the rate of legal interest as fixed by [La.Rev.Stat. Ann. § ] 9:3500."). *See also, Boston Old Colony Ins. Co. v. Tiner Assocs., Inc.*, 288 F.3d 222, 233–34 (5th Cir.2002) (allowing interest under Louisiana statute from date of filing of complaint and post-judgment interest—on the compounded amount of the judgment and the pre-judgment interest—at the federal rate); *In re Orion Refining Corp.*, 372 B.R. 688, 703–04 (Bankr.D.Del.2007).

In this case, the complaint was filed on June 19, 2003. (FOF 5.) Therefore, pre-judgment interest will be allowed from that date to today's date at the rates set forth in the Louisiana statute. La.Rev. Stat. Ann. § 13:4202(B)(1). Post-judgment interest (on the amount of the judgment plus the pre-judgment interest) shall be paid in accordance with 28 U.S.C. § 1961(a). *Boston Old Colony Ins. Co.*, 288 F.3d at 233–34.

### IV. CONCLUSION

For the above-stated reasons, the Court will grant judgment in favor of Syracuse in the amount of $156,342.87 for the value of the Surplus Material left at the premises on April 1, 2002, when it was converted by Orion. Although the Court finds that Syracuse breached the Agreement, it will deny Orion's counterclaim for failure to

---

11. As noted above, all of the Surplus Material that had been sold to Syracuse remained at the Refinery at the time of the sale to Valero. (FOF 7–8.) Therefore, Orion could not have incurred any costs in removing the Surplus Material after Syracuse left.

establish the amount of any damages suffered by it as a result of that breach. The Court will grant pre-judgment interest to Syracuse in accordance with Louisiana law. Accordingly, the Court will direct Orion to disburse the sum of $156,342.87 plus pre– and post-judgment interest to Syracuse from the escrow established under the Sale Order. The remainder of the escrow will be distributed to Orion.

An appropriate Order is attached.